**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 98-10600

_____

In the Matter of: RUTGER SCHIMMELPENNINCK, Curator
of the Estate of Harris Adacom Corporation B.V.;
WOUTER J.P. JONGEPIER, Curator of the Estate of
Harris Adacom Corporation B.V.

                                              Debtors,

-----------------------------

RUTGER SCHIMMELPENNINCK, Curator of the
Estate of Harris Adacom Corporation B.V.;
WOUTER J.P. JONGEPIER, Curator of the
Estate of Harris Adacom Corporation B.V.

                                              Appellants,

                        versus

JAMES J. BYRNE,

                                              Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____
July 29, 1999

Before JOLLY, WIENER, and PARKER, Circuit Judges.

WIENER, Circuit Judge:

     This appeal presents complex issues that arise at the
confluence of a Dutch bankruptcy proceeding and a Texas state court
lawsuit.  Appellants, Rutger Schimmelpenninck ("RJS") and Wouter

J.P. Jongepier ("WJP") are the Curators[1] of Harris Adacom Corporation, B.V. ("HACBV" or "Debtor"), the debtor in a liquidation proceeding[2] filed in Amsterdam, the Netherlands. During administration of the estate, a creditor of HACBV, James T. Byrne ("Byrne" or "Appellee"), filed suit in Texas state court (the "Byrne Lawsuit") against Harris Adacom Network Services ("HANS"), a wholly-owned subsidiary of the Debtor, alleging, <u>inter alia</u>, that, under theories of alter ego and single business enterprise, the subsidiary, HANS, is responsible for the debts that its parent, the Debtor, purportedly owed to Byrne. In an attempt to preserve for the estate the value of the Debtor's ownership interest in HANS by preventing diminution of the subsidiary's assets through the execution of an improvidently granted judgment, the Curators filed this ancillary proceeding in the United States Bankruptcy Court in the Northern District of Texas. In it they requested declaratory and injunctive relief to prevent Byrne from prosecuting his alter ego and single business enterprise claims against HANS in the Byrne Lawsuit.[3]

---

[1]The office of curator in a Dutch bankruptcy is the equivalent of a trustee in a United States bankruptcy.

[2]Roughly the equivalent of a Chapter 7 proceeding in a United States bankruptcy.

[3]In addition to his indirect claims, Byrne brought direct claims against HANS for breach of contract, fraud, and quantum meruit. The Curators are not challenging Byrne's pursuit of these claims because they are direct claims for wrongs alleged to have been committed by HANS. The Curators only seek to enjoin Byrne from prosecuting his alter ego and single business enterprise

The bankruptcy court, and the district court on appeal, denied the Curators' request for declaratory and injunctive relief. These courts' analyses were grounded in their equating of Byrne's claims to those raised by a similarly situated creditor in S.I. Acquisition, Inc. v. Eastway Delivery Service (In re S.I. Acquisition).[4] In S.I. Acquisition, we established a two-part, disjunctive test for determining whether a creditor's indirect claim alleging alter ego against a non-bankrupt corporation affiliated with the debtor corporation is subject to the automatic stay provisions of the Bankruptcy Code (the "Code"): Does the creditor's cause of action either (1) "belong to" the corporate debtor, or (2) seek "recovery or control of property" of the corporate debtor. If the first question gets a "yes" answer, the inquiry is over; but if the first is answered "no," the second question must be asked and answered. In S.I. Acquisition, we answered the first question in the affirmative, holding that the creditor's alter ego claim against a non-bankrupt affiliate —— the parent corporation of the bankrupt subsidiary corporation which actually owed the debt —— "belongs to" the corporate debtor and is therefore subject to the automatic stay. As such, we did not reach the second, "recovery or control of property" question.

In the instant case, the bankruptcy and district courts

_____

claims because they are indirect, derivative claims that attempt to recover from HANS debts owed by HACBV.

[4]817 F.2d 1142 (5th Cir. 1987).

identified what they believed to be significant factual distinctions that removed Byrne's claim from the S.I. Acquisition model. Specifically, in contrast to the creditor's efforts in S.I. Acquisition to reach the Debtor's parent corporation by piercing the corporate veil ("direct piercing"), Byrne has engaged in veil-piercing in an effort to reach the Debtor's subsidiary, HANS ("reverse piercing"). The district court concluded that the underlying policy of Texas alter ego law, which deems a control corporation liable for its affiliated corporation's obligations when that control entity misuses the corporate form, would be frustrated if HACBV could pierce its own veil to rectify an abuse that it had caused. Stated otherwise, HANS, the entity that Byrne seeks to reach, is controlled by the Debtor, HACBV; it is not the controlling entity that has misused the corporate form through the entity it controlled.

Focusing narrowly on this factual difference, the bankruptcy and district courts could discern no legal justification for concluding that Byrne's claims based on alter ego and single business enterprise "belonged to" the corporate debtor, HACBV, and therefore denied injunctive relief. In so doing, those courts apparently failed to note the distinction between the technical ascription of the veil-piercing cause of action as property of the putatively abusing debtor and the actual claim of the Curators for the benefit of the creditors, to whom no inter-corporation abuse could be ascribed.

4

We conclude that the bankruptcy and district courts erred as a matter of law in two respects:  First, after answering the first S.I. Acquisition question ("belongs to") in the negative, the district court stopped its testing, rather than proceeding to consider the second question of the test —— whether the creditor is seeking "recovery or control" of property of the debtor's estate —— as an alternative reason for granting injunctive relief.  Second and more compelling, the district court evaluated Byrne's alter ego and single business enterprise claims under S.I. Acquisition and the stay provisions of the wrong Bankruptcy Code section —— section 362 —— which requires that the creditor's claim affect "property of the debtor's estate" to be eligible for injunctive relief.  As a proceeding that is purely ancillary to a foreign bankruptcy, however, this case is governed not by section 362 at all, but by section 304 of the Code, which authorizes a court to grant injunctive relief against actions seeking to recover property "involved in" a foreign bankruptcy.  In contrast to section 362's effects in a full-blown, domestic bankruptcy case, section 304 of the Code does not create the legal concept of "property of the estate."  Additionally, section 304's threshold for enjoining actions in foreign bankruptcies is lower than that of section 362 in domestic bankruptcies.  It follows that any analysis defining "property of the estate" is superfluous and essentially inapposite.

Even so, whether we analyze this case under section 362 and S.I. Acquisition as did the bankruptcy and district courts, or

under section 304, the equitable principles of bankruptcy overarch our inquiry. "Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that."[5] The Code furthers this design by permitting a foreign debtor to enjoin actions by U.S. creditors that seek to collect or control property that is involved in the foreign bankruptcy. Ultimately, the interests of all creditors, foreign and domestic, are to be put on a level playing field, with like-situated claimants being treated equally. If Byrne were allowed to proceed with his alter ego and single business enterprise claims, it would oppugn the very equitable foundation on which bankruptcy is built. Not only would Byrne unjustly gain a first-come/first-served preference, but the remaining creditors of HACBV (and, for that matter, HANS) would suffer a concomitant disadvantage.

We conclude that Byrne's alter ego and single business enterprise claims against HANS, as asserted in the Byrne Lawsuit, advance a general grievance of all of HACBV's creditors (not a personal grievance exclusive to Byrne) which must be asserted, if at all, by the Curators for the ultimate benefit of the creditors. Consequently, we reverse the holding of the bankruptcy court, as affirmed by the district court, and grant the Curators' requested declaratory and injunctive relief, proscribing the prosecution of

---

[5]H.R.Rep. No. 595, 1st Sess., at 340 (1977).

6

these claims and thereby limiting Byrne's remedy to that which is available to him in the foreign bankruptcy.

**I.**

**FACTS AND PROCEEDINGS**

The operable facts of this case arise from corporate restructurings, asset transfers, and officer reassignments in a large-scale communications business. In 1990, Harris Corporation sold its data communications business to Adacom Corporation in exchange for cash, stock, and promissory notes payable to Harris (the "Adacom Acquisition"). Following the closing of this transaction, Adacom changed its name to Harris Adacom Corporation ("HAC"). When the Adacom Acquisition was consummated, Byrne, who had previously managed Harris's data communications business, became an executive employee of HAC, eventually acquiring approximately 8% of HAC's outstanding stock as well.

In July of 1992, HAC formed HANS as a wholly-owned subsidiary. HAC contributed its North American computer network services to HANS in exchange for 100% of HANS's stock. In 1993, HAC formed a Netherlands subsidiary, HACBV, to which it transferred all of its stock in HANS in consideration for HACBV's assumption of the HAC promissory notes originally owed by HAC to Harris by virtue of the Adacom Acquisition. Following this transaction, the structure of the companies was as follows: HAC was the parent of HACBV and, in turn, HACBV was the parent of HANS, i.e., HANS was the wholly-owned

7

subsidiary of HACBV, which was the wholly-owned subsidiary of HAC. Byrne maintains that, coincident with this corporate restructure, he entered into an agreement with HAC and HACBV (the "Redemption Agreement") under which he exchanged his stock in HAC for stock in HACBV, and HACBV agreed that, on any eventual sale of HANS, HACBV would redeem Byrne's HACBV stock for at least $2.9 million.

In June of 1994, HACBV declared bankruptcy in the Netherlands, and the District Court of Amsterdam appointed RJS and WJP as the curators of HACBV. While still in bankruptcy, HACBV appointed Byrne as sole director of its subsidiary, HANS. In that capacity, Byrne asserts, he was requested by RJS to sell HANS as quickly as possible. According to Byrne, he reminded RJS of his (Byrne's) right to receive at least $2.9 million for his shares of HACBV stock when and if HANS were sold. Byrne further contends that RJS assured him (Byrne) that he would be "taken care of." In contrast, the Curators claim that, as Curator for HACBV, RJS entered into a written agreement with Byrne which described both the services Byrne would render in connection with the sale of HANS and the compensation he would receive.

Nevertheless, Byrne presented the Curators with his bankruptcy claim against HACBV for $2.9 million, conditioned on HANS being sold, as provided in the alleged Redemption Agreement. RJS, acting in his capacity as one of HACBV's Curators, informed Byrne that his claim — if valid at all — was, at most, an ordinary claim in the HACBV bankruptcy.

8

In March of 1995, HANS sold all its assets for approximately $20 million. The Curators concede that Byrne performed services in connection with the sale, but insist that he was fully compensated pursuant to the written agreement. Byrne asserts that once HANS was sold, his demand for remuneration was rebuffed by HACBV and RJS. In April of 1995, the month following the sale of HANS, Byrne was removed by HACBV from his position as sole director of HANS.

In August of that year, Byrne filed the Byrne Lawsuit. In it he asserted claims against HANS (HACBV's subsidiary) for breach of contract, fraud, and quantum meruit, and against HAC (HACBV's parent) for fraud, quantum meruit, tortuous interference with a contract, and fraudulent transfer. Byrne amended his petition to include a claim that HACBV (the Debtor), HAC (the Debtor's parent), and HANS (the Debtor's subsidiary) were operated as a single business enterprise or were each others' alter egos, as a result of which HANS is independently liable for HAC and HACBV's contractual obligations to him.

Two years later, consistent with the Code, the Curators filed an ancillary proceeding in the United States Bankruptcy Court, requesting: (1) a declaration that any claims against HANS or other subsidiaries of HACBV based on a theory that HACBV is a member of a single business enterprise with, or the alter ego of, another person or entity, are the sole and exclusive property of the Debtor, HACBV, and (2) a preliminary and permanent injunction against the prosecution in this country of any action against HANS,

the subsidiary of the Debtor, with respect to the property of the Debtor. After a hearing, the bankruptcy court denied the declaratory and injunctive relief requested by the Curators and enjoined HANS from transferring funds to HACBV until the Byrne Lawsuit was resolved. The Curators appealed to the district court, which affirmed the bankruptcy court's order. Both the bankruptcy and district courts reasoned that our decision S.I. Acquisition, in which we concluded that an alter ego claim asserted by a creditor against a non-bankrupt parent of its debtor subsidiary is property of the debtor's estate, did not apply to Byrne's claim against HANS. The Curators timely filed this appeal.

Meanwhile, in April of 1998, the Byrne Lawsuit proceeded to trial in state court, in which the jury returned a verdict against Byrne, rejecting all material issues. Specifically, the jury failed to find that Byrne, HAC, and HACBV ever entered into the Redemption Agreement. This pretermitted the jury's addressing the issue whether, pursuant to alter ego and single business enterprise theories, HANS should be responsible for HACBV's obligations under the Redemption Agreement. After post-trial motions, the state trial court rendered judgment that implements the jury's verdict and thus provides no recovery to Byrne. At the request of the Curators, the bankruptcy court declared that the Byrne Lawsuit had been "resolved" within the meaning of that court's order that had enjoined HANS from transferring funds to HACBV. Accordingly, the bankruptcy court concluded that the injunction had lapsed by its

10

own terms, entitling HANS freely to transfer assets to HACBV. Byrne's counsel stated in open court that he intended to appeal the state court's judgment in the Byrne Lawsuit.

## II.

## ANALYSIS[6]

A.  Standard of Review

We review a denial of declaratory or injunctive relief for abuse of discretion.[7]  When such relief has been granted or denied by a bankruptcy court, we perform the same task as the district court: we review the bankruptcy court's findings of fact for clear error and issues of law de novo.[8]

As there are no outstanding issues of fact surrounding the Curators' request for declaratory and injunctive relief or the bankruptcy and district courts' denial of such relief, our review

---

[6]Appellants submitted a motion, which was carried with the case, to supplement the record on appeal with additional documents: (1) the judgment and post-trial motions from Texas state court in the Byrne Lawsuit, and (2) the motions and hearing to lift the injunction from the bankruptcy court.  We conclude that only the outcome of the Byrne Lawsuit, and not its substance, is relevant to this appeal.  As the outcome is evident from the injunction proceedings and Appellee does not object to supplementing the record with these proceedings, we grant the motion, in part, to allow inclusion of subsections (f) through (h), but deny the motion with respect to subsections (a) through (e).

[7]North Alamo Water Supply Corp. v. City of San Juan, 90 F.3d 910, 916 (5th Cir.), cert. denied, 519 U.S. 1029 (1996); Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc., 62 F.3d 690, 693 (5th Cir. 1995); Pembroke v. Wood County, 981 F.2d 225, 228 (5th Cir.), cert. denied, 508 U.S. 973 (1993).

[8]Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 626 (5th Cir. 1995), cert. denied, 519 U.S. 821 (1996).

is de novo. And, because the bankruptcy court's order contained holdings without accompanying reasons, we focus predominately on the comprehensive analysis performed by the district court, which affirmed the legal conclusions of the bankruptcy court.

B.   Declaratory and Injunctive Relief under section 362

The Curators contend that the district court erred when it affirmed the bankruptcy court's denial of their request for a declaration that the alter ego and single business enterprise claims are property of the HACBV bankrupt estate. They insist that the Byrne Lawsuit is functionally equivalent to the litigation addressed in S.I. Acquisition, in which a creditor's alter ego lawsuit against a non-bankrupt affiliate of the debtor was deemed property of the bankrupt estate and thus subject to the automatic stay provisions of the Code. As the Curators, like the bankruptcy and district courts, rely principally on S.I. Acquisition, we find it helpful and instructive to examine the opinion closely.

1.   In Re S.I. Acquisition

In S.I. Acquisition, we were required to decide whether a creditor's alter ego suit against the bankrupt corporate debtor's non-bankrupt parent was subject to the automatic stay provisions of section 362 of the Code.[9]   Eastway Delivery Services, Inc.

---

[9]Section 362(a) provides, in pertinent part:

(a) [A] petition filed under section 301, 302, or 303 of this title
. . . operates as a stay, applicable to all entities, of —
     (1) the commencement or continuation . . . of a judicial,
     administrative, or other action or proceeding against the

12

("Eastway"), a creditor of S.I. Acquisition, Inc. ("SIA"), had filed suit against SIA for breach of contract. Eastway had also named as defendants various companies affiliated with SIA on the theory that these affiliates were alter egos of SIA. During pendency of the suit, SIA filed bankruptcy and, pursuant to the automatic stay, was severed from Eastway's lawsuit. Eastway continued to prosecute the suit against the non-bankrupt affiliates

---

> debtor . . . or to recover a claim against the debtor .
> . . ;
> (2) . . .;
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; . . . .

11 U.S.C. § 362(a) (1994). The section 362 automatic stay does not apply in this case, however, because HACBV is in bankruptcy in the Netherlands and must affirmatively seek injunctive relief under section 304 of the Code. The district court noted that the parties did not dispute that the section 304 injunction performs the same function as the section 362 automatic stay, and therefore concluded that the section 362 stay sought in S.I. Acquisition is sufficiently analogous to the section 304 relief requested by Appellants to apply our reasoning from that case to this one.

As will be discussed infra in more detail, this conclusion led to fundamental errors in the district court's analysis and the parties' briefs on appeal. The bankruptcy court, the district court, and the parties throughout this litigation relied solely on the S.I. Acquisition analysis, which interpreted section 362's requirement that any claim affected by the automatic stay must be "property of the estate." This requirement, however, is not found in the applicable subsection of section 304. As similarities between the automatic stay in domestic bankruptcies and injunctive relief in foreign bankruptcies have been recognized previously, we will apply the dictates of S.I. Acquisition. See, e.g., In re Banco Nacional, 91 B.R. 661, 664 (Bankr. S.D.N.Y 1988) (recognizing that the injunctive relief under section 304 "is not unlike the injunction which is automatic in a chapter 7 or 11 case pursuant to section 362 of the Code"). Later in the opinion, however, we will discuss the more appropriate analysis under section 304 of the Code.

13

of SIA, but SIA argued that, because the alter ego claim was property of the bankruptcy estate, continuation of the suit violated the automatic stay.[10]

Drawing from American Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.), a prior decision of ours that addressed the effect of the automatic stay on "corporate trust fund" and "denuding the corporation" causes of action,[11] our panel in S.I. Acquisition set forth the analytical scheme under which it would determine whether the section 362(a)(3) automatic stay applied to Eastway's alter ego claims:

> (1) the automatic stay applies to a cause of action that under state (or federal) law belongs to the debtor, or
>
> (2) the automatic stay applies to a cause of action that seeks to recover property of the estate when the property is held or controlled by a person or entity other than the debtor, and
>
> (3) in applying the above rules, a court must keep in mind the general bankruptcy policies of securing and preserving the debtor's property and ensuring equal distribution of the debtor's assets to similarly-situated creditors.[12]

Applying this legal framework, the panel determined that, under the first prong of the analysis, "Eastway's alter ego action is a right of action belonging to SIA and, as such, is 'property of the

---

[10]S.I. Acquisition, 817 F.2d at 1143-45.

[11]714 F.2d 1266 (5th Cir. 1983). The corporate trust fund and the denuding the corporation doctrines impose personal liability on those who use their power of control for their personal benefit rather than that of the corporation. Id. at 1272.

[12]S.I. Acquisition, 817 F.2d at 1150.

14

estate'" subject to the automatic stay.[13]  As noted above and as will later be seen as important to our analysis, the S.I. Acquisition court, by answering the first question in the affirmative, ended the inquiry and thus (correctly) never reached the second prong of the test.

We determined in S.I. Acquisition that, even though, under Texas law, claims based on alter ego and other piercing-the-corporate-veil theories are typically brought by a creditor, nothing prevents a corporation from asserting such a claim against its own subsidiary or affiliated companies.[14]  Our reasoning was two-fold.  First, we noted that the policy behind Texas veil-piercing theories is "that the control entity that has misused the corporation form will be held accountable for the corporation's obligations."  Accordingly, to meet its corporate obligations, the corporation may pierce its own corporate veil to reach those who have misused it.[15]

Second, we surmised in S.I. Acquisition that, by keeping Eastway from asserting its veil-piercing action, the general policies of the Bankruptcy Code would be furthered:  All of SIA's

---

[13]Id. at 1153 (emphasis added).

[14]Id. at 1152; see also In re MortgageAmerica Corp, 714 F.2d at 1270-72 (holding that the trust fund and denuding theories of recovery were considered to belong to the debtor corporation because each action was created for the benefit of the corporation, i.e., to vindicate injury to the corporation caused by improper actions by control persons).

[15]S.I. Acquisition, 817 F.2d at 1152.

15

creditors — including but not limited to Eastway — would benefit from having more assets available to satisfy their claims. Otherwise, any creditor could seek remuneration from the debtor's affiliates, and the multi-jurisdictional, first-come/first-served, unequal distribution, which cuts against the policies of the Code, would be promoted.[16]  For these reasons, we stayed Eastway's state law alter ego claim against the debtor's affiliates.[17]

As we were in S.I. Acquisition, we are called on here to decide whether Byrne, as an individual creditor of the bankrupt corporation, HACBV, can assert his claim against an affiliate of that debtor — in this case, its wholly-owed subsidiary, HANS — that is not directly obligated to the creditor on that particular claim.  In making this decision, we must apply Texas law and determine the extent of the Debtor's interest in the alter ego and

---

[16]Id. at 1153-54.

[17]Id. at 1154.  The Second, Fourth, and Seventh Circuits agree with the holding in S.I. Acquisition that a creditor's alter ego claim belongs to the corporate debtor in bankruptcy.  See Kalb, Voorhis & Co. v. American Financial Corp., 8 F.3d 130 (2d Cir. 1993) (applying Texas law); St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688 (2d Cir. 1989) (applying Ohio law); Steyr-Daimler-Puch of America Corp. v. Pappas, 852 F.2d 132 (4th Cir. 1988) (applying Virginia law); Koch Refining v. Farmers Union Central Exch., Inc., 831 F.2d 1339 (7th Cir. 1987), cert. denied, 485 U.S. 906 (1988) (applying both Illinois and Indiana law).  The Sixth and Eighth Circuits, however, disagree.  Both courts denied the corporation in bankruptcy the right to bring alter ego claims on behalf of its creditors.  See Spartan Tube and Steel, Inc. v. Himmelspach (In re RSC Engineered Prods. Co.), 102 F.3d 223 (6th Cir. 1996) (applying Michigan law); Mixon v. Anderson (In re Ozark Restaurant Equip. Co.), 816 F.2d 1222 (8th Cir.) (applying Arkansas law), cert. denied sub. nom., Jackoway v. Anderson, 484 U.S. 848 (1987).

16

single business enterprise claims that Byrne is seeking to assert.[18] Keeping in mind the legal framework articulated in S.I. Acquisition, we turn aside briefly to explore the treatment of alter ego and single business enterprise claims under Texas law.

2.   Alter Ego and Single Business Enterprise Theories

Texas recognizes various legal theories that facilitate disregarding the corporate form, i.e., piercing the corporate veil, two of which are alter ego and single business enterprise.  An alter ego remedy is available when there is an identity or unity between a corporation and either a natural person or an affiliated entity such that all separateness between the parties has ceased (or never existed) and failure to disregard the corporate form would be unjust.[19]  A single business enterprise remedy likewise defeats the corporate form, but is appropriate when two or more organizations that are separate de jure pool or integrate their resources de facto to achieve a common business purpose.  If such commonality is established, each constituent organization may be held liable for the debts incurred by one or more of the others in

---

[18]To ascertain the property ownership of a foreign bankruptcy estate, the law of the jurisdiction where the section 304 proceeding is pending determines whether the debtor has a valid ownership interest in the property.  Once the foreign debtor establishes an interest in the property, the law of the jurisdiction where the foreign proceeding is pending determines whether such interest becomes property of the bankrupt estate.  See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag), 961 F.2d 341, 348 (2d Cir. 1992).

[19]Castleberry v. Branscum, 721 S.W.2d 270, 272 (Tex. 1986).

pursuit of that common business purpose.[20]

With this basic understanding of the state law aspects of Byrne's veil-piercing claims in mind, we proceed to examine the bankruptcy facet of S.I. Acquisition's framework. Throughout the instant litigation, the parties and the courts have focused solely on the first prong of the two-part test — whether Byrne's alter ego and single business enterprise claims "belong to" the HACBV estate. Although we too begin with that first prong, we do not stop there.

3.   Whether Byrne's claims "belong to" HACBV

The Curators maintain that Byrne's claim mirrors the alter ego claim in S.I. Acquisition and thus "belongs to" HACBV. We recognize the similarities between the facts in this case and those in S.I. Acquisition, but we cannot ignore their differences. In each case a creditor of the debtor sued a non-bankrupt affiliated entity, insisting that the defendant's relationship with the debtor is such that the debtor's corporate form should be disregarded to allow the creditor to collect from the non-bankrupt affiliate the debt owed by the debtor. Although Byrne's claim followed this general path, it was raised in a significantly different procedural context: HACBV had filed bankruptcy in a foreign liquidation proceeding, not in a United States proceeding, and — after its subsidiary was sued in Texas — affirmatively sought injunctive

---

[20]Old Republic Ins. Co. v. Ex-Im Services Corp., 920 S.W.2d 393, 395-96 (Tex. Ct. App. 1996).

18

relief pursuant to section 304 of the Code to protect its property in this country.

In addition to this procedural distinction, Byrne advances another element of his veil-piercing remedy as a distinguishing difference that bears review. Diametrically opposed to the "direct piercing" action instituted to reach the debtor's parent (the entity controlling the Debtor) in S.I. Acquisition, Byrne seeks to pierce the corporate veil to reach the Debtor's wholly-owned non-bankrupt subsidiary (the entity controlled by the parent), a variation referred to as "reverse piercing."[21] Byrne argues, and the bankruptcy and district courts agreed, that, because HACBV is the controlling party, the policy supporting a creditor's right to

---

[21]Piercing the corporate veil in "reverse" has been recognized in many jurisdictions as an equitable doctrine used to prevent injustice by corporate principals. See e.g. Stoebner v. Lingenfelter, 115 F.3d 576, 580 n.4 (8th Cir. 1997) (recognizing reverse piercing when other shareholders and creditors are not adversely affected); Scholes v. Lehmann, 56 F.3d 750, 758 (7th Cir.) (recognizing reverse piercing ordinarily in one-man corporations), cert. denied, 516 U.S. 1028 (1995); McCall Stock Farms, Inc. v. United States, 14 F.3d 1562, 1568 (Fed. Cir. 1993) (affirming the use of reverse piercing to seek repayment of corporate principals' debt from refunds due to the undercapitalized corporation); Dahl v. Gardner, 583 F. Supp. 1262, 1268 (D. Utah 1984) (collecting reverse piercing cases). Texas, in particular, has recognized the doctrine for over thirty years. See Zahra Spiritual Trust v. United States, 910 F.2d 240, 243-45 (5th Cir. 1990) (reverse pierce permitted to reach assets of corporation that was the alter ego of individual who owed tax debt); Zisblatt v. Zisblatt, 693 S.W.2d 944 (Tex. Ct. App. 1985) (wife sought to use reverse piercing in divorce action); Dillingham v. Dillingham, 434 S.W.2d 459 (Tex. Ct. App. 1968) (same); American Petroleum Exch., Inc. v. Lord, 399 S.W.2d 213 (Tex. Ct. App. 1966) (judgment creditor of shareholder sought to use reverse piercing to proceed against corporation's assets).

pierce the corporate veil —— to hold accountable those persons or entities that controlled and misused the corporate form —— would be undermined if we should hold that the veil-piercing claim "belongs to" the bankruptcy estate of the Debtor.[22]  This argument was made and accepted even though, like the automatic stay under the Code, the injunctive relief available to the Debtor as the parent would squarely block Byrne from pursuing the Debtor's shares of HANS stock, an asset of the parent corporation's bankruptcy estate that is clearly beyond the reach of the creditor, Byrne.

In response, the Curators insist that these facts present a distinction without a difference —— and we agree.  Whether, under a veil-piercing theory, a creditor seeks repayment from the shareholders of the debtor or from a subsidiary of the debtor —— assuming that creditor has no direct, independent claim for

---

[22]Appellee cites Southmark Corp. v. Crescent Heights VI, Inc. (In re Southmark Corp.), No. 95-10849 (N.D. Tex. July 26, 1996) (unpublished), aff'd, 95 F.3d 53 (5th Cir. 1996), for the proposition that reverse piercing is not available to an entity that abused the corporate form for its own benefit.  We view the facts in Southmark as clearly distinguishable from the facts at hand.  Moreover, the Southmark court specifically noted "[w]e do not hold that a shareholder could never use the reverse piercing doctrine under any circumstances."  The shareholder in Southmark sought to pierce the corporate veil of its subsidiary to transfer one of the subsidiary's assets, a promissory note, into its estate where the debtor could then assert a fraudulent transfer action that arose from a purchase agreement between the subsidiary and a third party.  The court forbade Southmark's piercing its own corporate veil because the "particular use of reverse piercing" did not further any equitable concerns.  Such is not the case for HACBV.  HANS has no separate, direct agreement with Byrne, and by enjoining Byrne from asserting his claims, all of HACBV's creditors will be protected.

20

repayment of the debt against the shareholder or subsidiary, i.e., no guarantee or co-signed instrument — Byrne's actions constitute an "end-run," skirting other creditors to reach the bankrupt estate. As the Curators urge, this is precisely Byrne's motive. It is undisputed that HANS is not <u>independently</u> or <u>directly</u> liable for the debt allegedly owed by HACBV to Byrne; nonetheless, Byrne seeks to recover this debt from HANS even though the bankrupt debtor, HACBV, is his sole obligor. By agglomerating to himself the other creditors' rightful pro-rata share of this asset (HANS) of the Debtor's estate, Byrne would obtain indirectly a very preferential status that he cannot obtain directly — a result that flies in the face of bankruptcy's structure and its equitable concerns.

We recognize the theoretical tension implicit in the question posed by the <u>S.I. Acquisition</u> court: How can Byrne's claims "belong to" HACBV when HACBV clearly controls the subsidiary, which it now seeks to reach? Any pause that we may be given by the issues of control posed by Texas law and adopted by the <u>S.I. Acquisition</u> court is merely transitory, though, given our conclusion that Byrne is seeking "recovery or control" of property of the Debtor within the meaning of the second prong of the <u>S.I. Acquisition</u> test.[23] In

---

[23]Although our holding is not based on the "belongs to" prong of the <u>S.I. Acquisition</u> analysis, we nonetheless briefly comment on its applicability. Texas law clearly regards the alter ego remedy as an equitable doctrine to "hold accountable those who have misused the corporation (i.e., the shareholders, officers, or directors)." Byrne insists that the right to pierce the corporate

21

reaching this conclusion, we pay particular attention to the third "guiding principle" articulated by the S.I. Acquisition court —— ensuring equal distribution of the debtor's assets to similarly situated creditors.

4.  Whether Byrne's claims seek "recovery or control" of HACBV property

We have neither been referred to nor found independently any case dealing directly with the second prong of S.I. Acquisition's disjunctive test.  We therefore decipher the meaning of "recovery or control" by turning again to S.I. Acquisition's "guiding principle."  Heeding our own analysis in In re MortgageAmerica, we emphasized in S.I. Acquisition that, when considering whether a creditor's cause of action "belongs to" the debtor or seeks "recovery or control" of property of the debtor, the Code's general

veil (or veils) cannot "belong to" HACBV because it is the very party that abused HANS's corporate form.  As HACBV is the entity with unclean hands, he insists, it cannot avail itself of the equitable remedy designed to rectify its own abuse.

Although initially this argument has an appealing ring, it is cut down by the blade that creates it: Equity.  The mere filing of a bankruptcy petition creates legal consequences for both the debtor and the creditors that are sheathed by the principles of equity.  For example, the moment that a petition for bankruptcy is filed, the fictional "estate" passes to trustees (or Curators in this case) for the benefit of all of the creditors.  The creditors are not only protected against fire sales by the debtor, but they can expect to receive a pro-rata distribution of the estate's residuary.  HACBV is currently in liquidation proceedings, and its creditors, through the actions of the Curators, should not be tarred with the brush of any pre-filing corporate abuses or wrongdoings by HACBV, its officers, or directors.  Stated differently, HACBV's alleged unclean hands should not preclude pro-rata distribution of its property because the real parties with an interest in HACBV's liquidated assets —— including, notably, HANS and its assets —— are all of its creditors.

policies of securing and preserving the debtor's property and ensuring equal distribution of that property to similarly situated creditors should remain a paramount concern.[24]

The legislative history of the Code is replete with support for this proposition. For example, a House Report reflects that the automatic stay provision was adopted to "provide[] creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors."[25] It is pellucid from this passage alone that Congress intended to protect all creditors. And, to ensure adequate protection, Congress gave the trustee the exclusive power to assert claims against the debtor's property for the collective benefit of creditors.[26]

5.  General and Personal Claims

It is in this perspective that the distinction between general and personal claims is both significant and consistent with the

---

[24]S.I. Acquisition, 817 F.2d at 1152.

[25]H.R.Rep. No. 595, 2nd Sess., at 340 (1978). We note that even though the automatic stay provision does not apply in this case, the injunctive relief that must be requested by the Curators embodies the same policy concerns.

[26]We do not imply that a creditor can never assert an individual claim against the debtor. Indeed, we intend just the opposite. Courts and commentators alike recognize differences between a "personal" claim — one in which an individual creditor has been harmed — and a "general" claim — one in which the creditors collectively have been harmed.

Bankruptcy Code.  It is axiomatic that a trustee has the right to bring actions that will benefit the estate.  Such claims can either be founded on the rights of the debtor or on the rights of the debtor's creditors. If the right belongs to the debtor's creditors, the distinction between personal and general claims takes on significance:  A trustee can assert the general claims of creditors, but is precluded from asserting those creditor claims that are personal.  In other words, even if a claim "belongs to" the creditor, the trustee is the proper party to assert the claim, for the benefit of all creditors, provided the claim advances a generalized grievance.[27]

We understand that characterizing an injury as personal or general traditionally comports with notions of standing.  A bankruptcy court has correctly recognized that "[i]njury characterization analysis should be considered as an inseparable component of whether an action belongs to the corporation or individual."[28]  We agree with that position and conflate the injury characterization analysis with not only the first, "belongs to,"

---

[27]But see Ellenberg v. Walliagha (In re Mattress N More), 231 B.R. 104, 109-10 (Bankr. N.D. Ga. 1998) (recognizing that from a policy perspective, a trustee should be able to pursue general alter ego claims as a representative of the estate, but concluding that no statutory basis under the Code exists for the trustee to do so).

[28]In re E.F. Hutton Southwest Properties II, Ltd., 103 B.R. 808, 812 (Bankr. N.D. Tex. 1989); see also, In re Mattress N More, 231 B.R. at 107-08 (discussing standing and whether the claim belongs to the debtor contemporaneously).

prong of the S.I. Acquisition test but with the second, "recovery or control" prong as well.  Consideration of whether a claim is general or personal should aid courts in deciding whether a claim seeks "recovery or control" of property of the debtor.  This analysis, we find, helps to crystallize the structure for determining when trustees can or cannot act on behalf of creditors in pursuing claims.

To capsulize this legal framework for determining whether the trustee or an individual creditor is the appropriate actor, we categorize three kinds of action:

1) Actions by the estate that belong to the estate;

2) Actions by individual creditors asserting a generalized injury to the debtor's estate, which ultimately affects all creditors; and

3) Actions by individual creditors that affect only that creditor personally.

The trustee is the proper party to advance the first two of these kinds of claims, and the creditor is the proper party to advance the third.  This construction ensures that the estate will not be wholly or partially consumed for the benefit of one creditor, or even a small number of creditors.  Moreover, preservation of the estate for the advantage of all creditors will (1) prevent multi-jurisdictional rushes to judgment, (2) save judicial resources, and (3) further the equitable principles of bankruptcy. To reiterate our earlier observation, in S.I. Acquisition we provided two circumstances in which the automatic stay would affect a creditor's

claim against a non-debtor affiliate of the debtor: (1) when the claim "belongs to" the debtor, or (2) when the claim seeks "recovery or control" of property of the debtor. And again, as we based our holding in S.I. Acquisition on the "belongs to" prong, we never needed to question whether the claims sought "recovery or control" of property of the debtor's estate.

As not all claims necessarily "belong to" the debtor —— because either by statute or common law the debtor is precluded from asserting the action —— another mechanism must exist to prevent individual creditors from annexing assets of the estate to gain an advantage. Injunctive relief is therefore necessary to prevent prosecution of actions that could lead to recovery or control of the debtor's property to the disadvantage of other similarly situated creditors.

Byrne's pursuit of his indirect claims against the non-bankrupt, wholly-owned subsidiary of the debtor exemplifies the need for such relief. His alter ego and single business enterprise claims seek to collect a debt allegedly owed by the Debtor by suing —— and hoping eventually to enforce a judgment against ——the Debtor's non-bankrupt subsidiary, HANS. Even if the Redemption Agreement exists and is enforceable, it provides no direct or independent claim against HANS. The claim is based entirely on Byrne's relationship with HACBV. Even though Byrne attempts to sue HANS, a non-debtor third party, his action is grounded in a claim

26

against the Debtor only.[29]

We find further support in Texas law, under which the viability of an action to reverse-pierce the corporate veil depends on finding that the debtor and the corporation should be treated as one entity or that one entity is a "mere tool or business conduit" for the other entity.[30] Although the creditor bears the burden of proving the inseparable relationship, for the claim to be characterized as personal to that creditor it must be based solely on the interaction between the debtor and its affiliate and in no way hinge on the creditor's interaction with either entity.[31]

In his petition in the Byrne Lawsuit, Byrne alleged that "HANS was not operated as a business entity separate from HAC or HACBV." He went on to explain the single business enterprise and alter ego theories to support his theory, seeking to hold HANS liable "for the debt of HACBV." The relief sought by Byrne — to ignore the limitations of liability of HACBV and HANS as separate corporate entities — is not peculiar or personal to his cause, but is common

---

[29]See In re Saunders, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989) ("While a fraudulent transfer action may be an action against a third party, it is also an action 'to recover a claim against the debtor.' Absent a claim against the debtor, there is no independent basis for the action against the transferee.")

[30]Zahra Spiritual Trust, 910 F.2d at 243-44 (noting that the ultimate goal in reverse piercing is unique: The court treats the individual and the corporation as "one and the same.").

[31]S.I. Acquisition, 817 F.2d at 1152 ("The doctrine of alter ego does not rest upon a particular creditor's dealings with or reliance on the control entity, nor does the doctrine require a showing of fraud on a particular creditor.").

to all of the creditors. If the entities are proved to exist as one, whether for failure to observe corporate formalities or as undercapitalized shell corporations, the assets and liabilities of the entities should be amalgamated for the benefit of all creditors, not Byrne alone. Indeed Byrne insists that other creditors of HACBV could institute the same kind of action as his, which would allow them to share in the equity, i.e., this residual asset value of HANS.

We are convinced that Byrne's alter ego and single business enterprise claims are general claims that ultimately seek to recover or control property of HACBV, and that such claims are the Curators' to enforce or not enforce. Accordingly, we reverse the district court's order denying the Curators' request for declaratory relief, and we declare that assertion of any such alter ego or single business enterprise claims must be initiated, if at all, by the Curators on behalf of all creditors.

C. An Alternative: Injunctive Relief under section 304

Even if reversal based on the bankruptcy and district courts' analyses under S.I. Acquisition and section 362 of the Code were not indicated, reversal —— and granting of declaratory and injunctive relief —— are mandated by proper application of section 304 of the Code. The Curators, on behalf of HACBV, filed a petition under section 304 seeking declaratory and injunctive relief to prevent Byrne from prosecuting his alter ego and single business enterprise claims against HANS. Section 304(a) authorizes

28

a representative of a foreign bankruptcy estate to commence an ancillary proceeding in the United States Bankruptcy Court.[32] The filing of a 304 petition does not create a bankruptcy "estate" that must be administered by a court in the United States, but it does allow the foreign debtor to prevent piecemeal distribution of its assets in the United States while its plan is being structured in the foreign jurisdiction.[33] Although section 304 contains no automatic stay provision, the bankruptcy court is given the authority in subsection (b) to:

> (1) enjoin the commencement or continuation of ⎯⎯
>     (A) any actions against ⎯⎯
>         (i) a debtor with respect to property involved
>             in such foreign proceeding; or
>         (ii) such property; or . . .
>
> (2) order turnover of the property of such estate, or
>     the proceeds of such property, to such foreign
>     representative; or
>
> (3) order other appropriate relief.

Subsection (b) is intended to arm the courts with maximum flexibility in light of principles of international comity and respect for the laws of foreign nations.[34] One court has referred to section 304's grant of judicial authority as tantamount to the power to mold relief "in near blank check fashion."[35]

---

[32]11 U.S.C. § 304 (1994).

[33]In re Koreag, 961 F.2d at 348.

[34]See H.R.Rep. No. 95-595, 2nd Sess., at 324-25 (1978).

[35]In re Culmer, 25 B.R. 621, 624 (Bankr. S.D.N.Y. 1982).

29

Even though injunctive relief under subsection (b) is available to a litigant, however, it is not to be granted automatically. Rather, the grant of such relief, being within the court's discretion, is guided by the six factors enumerated in section 304(c), with the economical and expeditious administration of the foreign estate being of paramount concern, to wit:

(1) just treatment of all holders of claims against or interest in such estate;
(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of such estate;
(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.[36]

The Curators complain that, because Byrne's alter ego and single business enterprise claims are "property of the HACBV estate," the bankruptcy and district courts abused their discretion in refusing to grant injunctive relief pursuant to section 304. As both courts concluded that Byrne's claims are not "property of the estate," the Curators' argument failed. The bankruptcy and district courts did not, however, consider subsections (b)(1) or (b)(3) — which provide alternative grounds for granting injunctive relief when the property in question is not "property of the estate." We find the plain language in these sections compelling

---

[36]11 U.S.C. § 304(c)(1)-(6) (1994).

30

and deserving of full review.

1.    Section 304(b): Is an Injunction Available?

Subsection (b)(1) of section 304(b) permits a bankruptcy court to enjoin actions "against the debtor with regard to property _involved in_ such foreign proceeding." We note first that, in the context of the automatic stay under sections 362(a)(1) and (a)(3), the phrase "against the debtor" has been extended to non-debtors when failure to enjoin the action would jeopardize the success of the bankruptcy process or cause irreparable harm to the debtor's estate and its creditors.[37] Generally, such a situation exists when the debtor and the non-debtor are closely related such that the debtor is the real party defendant and a judgement against the non-debtor will in effect be a judgment or finding against the debtor.[38]

The value of HACBV's ownership interest in HANS would be diminished were the subsidiary's assets seized to satisfy HACBV's alleged debt to Byrne. It follows that the remaining creditors of HACBV would share pro-rata in a smaller pie. Additionally, as HACBV and HANS are in a parent-subsidiary relationship and HACBV's equity in HANS is an asset that would otherwise be available to repay creditor debt, Byrne's obtaining and executing on a judgment against HANS would have an effect economically indistinguishable

---

[37]_S.I. Acquisition_, 817 F.2d at 1148; _In re Davis_, 191 B.R. 577, 586 (S.D.N.Y. 1996) (compiling citations).

[38]_S.I. Acquisition_, 817 F.2d at 1147-48; _Audio Data Corp. v. Monus_, 789 S.W.2d 281, 286 (Tex. Ct. App. 1990).

31

from his obtaining and executing on a judgment obtained post-petition directly against HACBV — which, of course, he cannot do. We will therefore apply the injunction to Byrne's action against HANS, the non-debtor, if his alter ego or single business enterprise claims regard or affect property <u>involved in</u> the foreign proceeding.

Few courts have discussed subsection (b)(1) in detail, particularly the conduct necessary for property such as a cause of action to be "involved in" the foreign proceeding.[39] On two occasions, however, a New York Bankruptcy Court faced the issue, both times in the context of actions seeking to collect insurance funds held in trust. <u>In re Lines</u>[40] and <u>In re Rubin</u>[41] involved American reinsurance companies that sued to collect insurance funds set up by foreign reinsurance companies that had become debtors in liquidation. In each case, the American company claimed that the foreign debtor had no interest in the fund because the claims of other beneficiaries exceeded the amount of the fund, leaving the debtor with no reversionary interest. The court disagreed and held

---

[39]Courts have noted, with curiosity, the different statutory language used in subsections (b)(1) and (b)(2). <u>See, e.g.,</u> <u>In re Koreag</u>, 961 F.2d at 349 (recognizing that Congress permits injunctions to be issued under subsection (b)(1) regarding property "involved in" the foreign proceeding, but subsection (b)(2) only authorizes turnover of "property of the estate," leading to the conclusion that the two sections must perform different functions).

[40]81 B.R. 267 (Bankr. S.D.N.Y. 1988).

[41]160 B.R. 269 (Bankr. S.D.N.Y. 1993).

that even if the debtor's reversionary interest was valueless, that interest was sufficiently connected to the debtor to be "involved in" the foreign liquidation proceeding, thereby entitling the debtor to injunctive relief.[42]

When today we apply Texas law, we come to the same conclusion. Byrne's argument that HACBV has no interest in his actions grounded in alter ego and single business enterprise theories because a control entity cannot pierce its own corporate veil to remedy its own abuse, is not dispositive of the "involved in" issue. Even assuming arguendo that HACBV is not the proper party to assert the veil-piercing action, that corporation, as the sole stockholder of HANS, nevertheless has an equity or property interest in HANS —— not unlike a reversionary interest —— sufficient for HANS to be "involved in" HACBV's foreign bankruptcy.[43]

Neither can we ignore the fact that Byrne filed a proof of claim in HACBV's foreign bankruptcy for the exact same debt that he seeks to collect from HANS in Texas through the alter ego and single business enterprise theories.[44] It is obvious beyond

---

[42]In re Rubin, 160 B.R. at 277; In re Lines, 81 B.R. at 271-72.

[43]See also In re Davis, 191 B.R. at 577 (granting injunctive relief under section 304(b)(1)(A) and stating "[g]iven the debtor's contingent liability for any judgment taken by [the creditor] against [affiliates of the debtor], it is appropriate for any such litigation to go forward in Canada").

[44]See In re Rubin, 160 B.R. at 277 n.11 ("[The creditor] has already filed a proof of claim . . . in the Israeli liquidation

33

peradventure that Byrne's own actions "involve" him in the foreign bankruptcy. As any claim Byrne could assert successfully in the foreign bankruptcy appeared certain to produce a lesser monetary recovery than 100 cents on the dollar, he attempted the Texas "end run," targeting a solvent affiliate of the Debtor. We hold, therefore, that Byrne's alter ego and single business enterprise claims are sufficiently "involved in" HACBV's liquidation proceedings in Amsterdam to warrant a section 304 injunction against pursuit of these claims in the United States.[45]

This holding does not, however, end our inquiry. As dictated by section 304's subsection(c), relief is appropriate only if we conclude that it will ensure an economical and expeditious administration of the estate. We turn therefore to the factors enumerated in section 304(c).

2.    Section 304(c): Propriety of an Injunction

Cognizant of the six factors mentioned above, we begin with subsections (c)(1) and (c)(3), which often work in conjunction with

---

proceeding. By his own actions, [the creditor] has involved the Trust in the foreign liquidation case, as have numerous other beneficiaries/creditors.").

[45]We note in passing that subsection (b)(3) provides another relief mechanism. Even if Byrne's claim were not sufficiently "involved in" the foreign proceeding to warrant injunctive relief under (b)(1), (b)(3) gives us the authority to order "other appropriate relief." In this case, "other appropriate relief" could include an injunction to prevent Byrne's "race to the courthouse" to gain a preferential benefit.

one another.[46]  Not only must all claim holders in a foreign bankruptcy receive just treatment, but the possibility of preferential treatment must be prevented.  As previously mentioned, if Byrne is not enjoined from asserting his alter ego and single business enterprise claims against HANS, he will be first in line to seize assets of HANS, up to the full amount of his judgment.  That, of course, would negatively affect the value of HACBV.  As previously recognized, not only would Byrne thus receive preferential treatment, but the remaining claim holders in the HACBV bankruptcy would be relegated to sharing pro-rata in the concomitantly diminished equity value of HANS.[47]  Consideration of these two factors therefore weighs in favor of granting injunctive relief.

We cannot, though, ignore the impact injunctive relief for HACBV would have on Byrne.  Subsection (c)(2) mandates protection of Byrne's claim against prejudice and inconvenience if he is forced to raise his claim in the foreign proceeding.  This factor requires us to consider Dutch bankruptcy law and its effect on

---

[46]Subsection (c)(6) is not relevant because the foreign debtors are not individuals.

[47]It is also likely that just treatment of all creditors would be impaired by the ongoing litigation and resources expended in the United States.  See In re Gercke, 122 B.R. 621, 629 (Bankr. D.D.C. 1991) ("To allow [the creditor's] claim to be tried in the United States now would threaten the just treatment of all holders of claims because the estate has inadequate resources to engage in a trial without threatening the [curators'] efforts to maximize the estate.")

Byrne's claim.

First, we agree with the Curators' contention that the mere fact that Byrne would have to pursue his claim against HACBV in a foreign proceeding is not sufficient prejudice to deny relief.[48] In fact, we require foreign creditors to litigate in the United States when seeking distributions in a domestic bankruptcy case.[49] From the translations of the Dutch Civil Code contained in the record, it is patently clear that Dutch law entitles Byrne to receive the same treatment that he would under Title 11. For example, section 3, article 277 of the Dutch Civil Code treats creditors as "equally entitled to be paid from the net proceeds of the goods of their debtor, . . . in proportion to the claim of each creditor, subject to priorities that have been acknowledged by law." Compare this to section 726 of the Code, which sets forth the general distribution rules for liquidation cases, giving priority to secured creditors first and then to unsecured creditors, with all claims in the same class receiving pro-rata treatment when there are insufficient funds to pay that class in full. Additionally, the Dutch Bankruptcy Act provides for a first creditor's meeting, similar to that provided under the Code.[50]

---

[48]See In re Davis, 191 B.R. at 585; In re Rubin, 160 B.R. at 269.

[49]See In re Brierley, 145 B.R. 151, 163 (Bankr. S.D.N.Y. 1992).

[50]Compare Dutch Bankruptcy Act, §§ 116, 119, 122 with 11 U.S.C. § 341 (1994).

Our review of the Dutch code articles governing bankruptcy satisfies us that creditors are afforded rights sufficiently akin to those provided in the Code to eschew prejudice. We are convinced that Byrne's claims will not be prejudiced when raised in the foreign proceeding.

Similarly, section 304(c)'s fourth factor calls for an examination of the foreign law governing the debtor's proceeding to ensure that the distribution of proceeds of the foreign bankrupt estate will occur substantially in accordance with Title 11. Although the foreign distribution scheme need not be identical to Title 11, it must be comparable.[51] Derived largely from above-cited article 277 of the Dutch Civil Code, the order of priority in a Dutch bankruptcy is as follows: (1) Special bankruptcy costs; (2) General bankruptcy costs; (3) Tax authorities; (4) Creditors with specific privileges related to specific assets; (5) Creditors with general privileges; and (6) Unsecured creditors.[52] A creditor who has retained ownership of a particular asset and holds either a mortgage or a pledge encumbering that asset can exercise his rights irrespective of the authority of the Curator. With this exception, preferences under Dutch law generally track the hierarchy of claims

---

[51]In re Gercke, 122 B.R. at 629.

[52]See also Dutch Civil Code, § 2, art. 23b.1 ("The liquidator transfers all that is left of the estate of the liquidated legal entity, after payment to the creditors in proportion to everyone's rights, to those that have rights resulting from the articles of association, or otherwise to the members or shareholders.")

37

in a domestic proceeding: (1) Secured claims; (2) Administrative expenses; and (3) Unsecured creditors. Under either scheme, Byrne's claim qualifies as an unsecured breach of contract claim arising, if at all, from the Redemption Agreement. Byrne has already filed his claim in the Dutch proceeding, so distribution of the foreign estate vis-à-vis his claim should occur substantially in accordance with Title 11.

Fifth and finally, we must evaluate the principles of comity to ensure that the Dutch proceeding does not offend our notions of justice. Foreign proceedings are generally recognized in the United States, as long as the foreign laws comport with due process and treat the claims of local creditors fairly.[53] We favor granting comity to foreign bankruptcy proceedings because "the assets of the debtor [can] be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion."[54] As noted in our analysis of the fourth factor, the foreign laws need not be identical to their counterparts under the laws of the United States; they merely must not be repugnant to our laws and policies.[55] As we have already found sufficient congruity between Dutch and American bankruptcy laws to eschew such repugnance, we

---

[53]Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 714 (2d Cir. 1987).

[54]Cunard S.S. Co. v. Salen Reefer Servs. A.B., 773 F.2d 452, 458 (2d Cir. 1985).

[55]In re Davis, 191 B.R. at 587; In re Rubin, 160 B.R. at 283; In re Brierley, 145 B.R. at 168.

conclude that principles of comity weigh in favor of granting the injunction sought by the Curators.

We are confident that Byrne's claim, already asserted in the Dutch liquidation proceeding, will receive essentially equal and fair treatment among other claimants who are members of his class of creditors. Dutch bankruptcy law clearly is not repugnant to Title 11 and the factors specified in section 304(c) are present. We therefore hold that the bankruptcy and district courts erred as a matter of law in refusing to grant the Curators injunctive relief. Finding that Byrne's efforts to recover from HANS the debt owed by HACBV, but not owed directly by HANS, violate applicable principles of both United States and Dutch bankruptcy law, we reverse the bankruptcy and district courts and grant the relief sought by the Curators.

## III.

### CONCLUSION

As a result of our section 362/S.I. Acquisition analysis of the Curators' entitlement to declaratory and injunctive relief, we find ourselves in disagreement with the judgments of the bankruptcy and district courts that denied such relief. In particular, we perceive error in the finding of those courts that a creditor's action based on reverse-piercing of a corporate veil does not constitute property of the bankruptcy estate of the parent

corporation even when, as here, the purpose of a creditor's veil-piercing suit in state court against the non-bankrupt, wholly-owned subsidiary of the Debtor, is to obtain a money judgment on an obligation that concededly is not owed directly by the subsidiary. Given our view that, generally, application of the equitable theory that a corporate debtor should not be allowed to profit from its untoward manipulations of an affiliated entity misses the mark here by failing to recognize that — at least in the context of this domestic bankruptcy proceeding ancillary to a foreign bankruptcy — pre-bankruptcy corporate misdeeds of the Debtor should not inure to the detriment of its general bankruptcy creditors, we conclude that the instant reverse-piercing action belongs to the Curators, not to one individual creditor of the Debtor.

More to the point, even if we assume <u>arguendo</u> that the bankruptcy and district courts correctly decided that Byrne's veil-piercing cause of action is not "property of the estate" under the first prong of <u>S.I. Acquisition</u>'s disjunctive test — the "belongs to" prong — those courts nevertheless erred in halting their inquiry at that point. Even though, as in <u>S.I. Acquisition</u>, a "yes" answer to the "belongs to" question ends the inquiry, a "no" answer to that first prong question requires the court to proceed to the second prong — the "recovery or control of property" question. Thus, the bankruptcy and district courts abused their discretion when, having answered the first prong's question in the negative, they failed entirely to address Byrne's reverse-piercing

40

action under the second prong of the S.I. Acquisition test.  As a correct application of the second "recovery or control" prong leads inevitably to a determination that Byrne's goal in attempting to reverse-pierce the veil of the non-bankrupt, wholly-owned subsidiary of the Debtor was the "recovery or control" of property of the Debtor, i.e., the estate's interest in HANS or its assets, those courts' failure to address recovery or control of the Debtor's property constitutes reversible error.  Based on S.I. Acquisition's take on section 362, we hold that the Curators are entitled to declaratory and injunctive relief.

Alternatively, we conclude that, when declaratory and injunctive relief is sought in a bankruptcy court in this country through proceedings that are ancillary to a foreign bankruptcy from a country whose laws are compatible with and not repugnant to ours, analysis of the ancillary case should be conducted not under section 362 of the Code but under section 304.  For the reasons we have explained, a proper section 304 analysis of the instant case makes the Curators' entitlement to the relief sought even clearer than it is when examined under section 362 and S.I. Acquisition. The Debtor's ownership of all issued and outstanding stock in HANS, a non-bankrupt affiliate, makes unavoidable the conclusion that HANS and its assets are "involved in" HACBV's bankruptcy for purposes of section 304.  As such, injunctive relief is highly appropriate if not absolutely required.

We therefore reverse the bankruptcy and district courts'

41

denial of the relief sought by the Curators, declare any veil-piercing action vis-à-vis HACBV and its affiliated companies to be "property of the estate" for purposes of HACBV's bankruptcy proceedings, and remand this case for entry of judgment permanently enjoining Byrne from prosecuting the portion or portions of his state court action in Texas that seek a money judgment against HANS, on veil-piercing (alter ego and common business enterprise) grounds, for claims on which HANS is not purported to be directly responsible as the primary obligor.

REVERSED and REMANDED.[56]

---

[56] We recognize that if the take-nothing judgment rendered against Byrne in the trial court in Texas is affirmed on appeal and becomes final, the judgment we render today will be moot.