# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 2, 2010

Lyle W. Cayce
Clerk

No. 09-10604

In the Matter of:
JAMES H. MOORE, III,

       Debtor.

* * * * * * * * * * * * * * *

THE CADLE COMPANY,

       Appellant,

versus

JEFFREY H. MIMS; JAMES H. MOORE, III; ELIZABETH A. MOORE;
JHM PROPERTIES; BRUNSWICK HOMES, LLC,

       Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, CLEMENT, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

No. 09-10604

Appellant The Cadle Company ("Cadle"), the major creditor of the bank-ruptcy estate of James H. Moore, III ("Moore"), appeals the district court's af-firmance of the bankruptcy court's approval of a settlement of estate claims over its objection and despite its offer to purchase the claims for higher value. We re-verse and remand, concluding that the claims at issue could be sold as well as compromised and that the bankruptcy court's failure to consider the effect of such a sale was an abuse of discretion.

I.

Cadle sued Moore in state court more than a year before Moore filed for bankruptcy, seeking to recover a judgment it owned against him. The complaint also named Moore's wife Elizabeth Moore ("Elizabeth"), JHM Properties, Inc. ("JHM"), and Brunswick Homes, LLC ("Brunswick").[1] In essence, Cadle alleged that from 1997 to 2002, Moore used various business entities to shield his per-sonal assets from creditors. Specifically, Cadle asserted claims of reverse veil-piercing against Brunswick and JHM and fraudulent conveyance against JHM and Elizabeth. It also sought a constructive trust against the assets of Bruns-wick, JHM, and Elizabeth.

Summary judgment motions had been filed, and a ruling was pending when Moore filed for bankruptcy, staying the litigation. The chapter 7 trustee, Jeffrey Mims, inherited the case and retained Cadle's attorneys as special coun-sel.

Cadle is the estate's largest creditor. It filed proofs of claim for roughly $12.5 million, or 86% of the unsecured debt. Because Moore represented that he had no assets for distribution, asset recovery litigation was the only potential means for creditors to receive any payment. Cadle thus continued to fund the

---

[1] Elizabeth owns 100% of JHM, which owns 50% of Brunswick; Moore was president of Brunswick. We refer to Moore, Elizabeth, JHM, and Brunswick collectively as "defendants."

litigation after it came under the trustee's control. It advanced over $60,000 in attorneys' fees to the trustee's attorneys––Cadle's former attorneys––to continue prosecution of the claims.

As the legal fees continued to mount without resolution, Cadle sought a more active role. In January 2007, it offered to purchase the claims from the trustee for $10,000. The trustee refused as to the amount but did not reject the possibility of a sale. Instead, he proposed a three-part counteroffer: $150,000 in cash; 10% of any gross recovery; and waiver of Cadle's $12.5 million in claims against the estate.

Cadle refused that counteroffer but continued to negotiate. It asked the trustee either to sell the claims to it for $15,000 or to auction them to the highest bidder. The trustee refused both options. Cadle raised the cash offer to $30,000 and continued to ask for an auction. The trustee again refused.

Meanwhile, the bankruptcy court ruled on the summary judgment motions pending at the time of removal. It denied Brunswick's motion but was openly hostile to reverse veil-piercing as a viable theory under Texas law.

After the court's ruling, the case seemed to be on course for trial. The trustee asked Cadle to fund a forensic accountant, but Cadle refused unless the trustee could provide a cost estimate. Apparently Cadle's withholding of *carte blanche* caused the trustee to re-evaluate the case. The trustee did not hire its own expert and instead began negotiating a settlement with defendants. He did not notify Cadle of this change in strategy, though Cadle had consistently demonstrated a strong desire to press the case to trial. The trustee eventually entered a proposed settlement of the claims with the defendants for $37,500.

Cadle first learned of the proposed settlement once the trustee had filed his motion for approval with the bankruptcy court. Cadle contacted the trustee and offered immediately to pay $50,000 for the claims. It also filed an objection to the proposed settlement in the bankruptcy court, urging that the proposed

settlement was essentially a sale of estate assets and that the trustee therefore had a duty to maximize the value of the claims. Cadle argued that the trustee could not push through a settlement for a lesser amount than the major creditor was willing to pay the estate. Cadle asked instead that the claims be sold to it or auctioned to the highest bidder.

At the hearing to approve the settlement, the trustee's attorney characterized Cadle's $50,000 offer as a "substantial offer" and stated that accepting it could be in the best interest of creditors. The trustee's attorney also acknowledged that $50,000 was "substantially more than the settlement amount" and that the objective of the trustee was to maximize the funds available to creditors in this "no-asset case." Finally, the attorney assured the court that either conducting an auction or selling the claims to Cadle would dispose of them permanently, and the court would no longer have to face this issue. R. 1171-74. The court, however, was unconvinced that a sale was possible. It questioned whether a trustee "can sell causes of action such as avoidance actions, particularly avoidance actions." R.1194.

A second hearing was held, and Cadle urged the same arguments. Defendants responded that it would be unfair to them if the court were to upset the proposed settlement.

In a ruling from the bench, the bankruptcy court determined that the settlement was in the best interest of the estate. That conclusion was based in part on the court's misgivings as to whether the trustee could sell these claims. It concluded as a matter of law that the claims could not be sold. R. 1315-16.

The court thus believed it had only two options: Approve the settlement or require the trustee to continue litigating the claims. The court questioned whether reverse veil-piercing is a well-grounded legal theory, reasoned that litigation would be expensive for the estate, and suggested that the trustee would have difficulty collecting any judgment. The court also believed that the views

4

No. 09-10604

of Brunswick, as a "contingent" creditor, merited consideration, because Brunswick had filed a $12 million indemnity claim against the estate, the "contingency" being the success of the reverse veil-piercing claims. The district court affirmed the rulings of the bankruptcy court.

## II.

"We review a district court's affirmance of a bankruptcy court decision by applying the same standard of review to the bankruptcy court decision that the district court applied." *Barner v. Saxon Mort. Servs., Inc. (In re Barner)*, 597 F.3d 651 (5th Cir. 2010) (citation and internal quotation marks omitted). We review the bankruptcy court's settlement approval for abuse of discretion and its conclusions of law *de novo*. *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp.* (*In re Foster Mort. Corp*.), 68 F.3d 914, 917 (5th Cir. 1995). A lower court "by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). "Accordingly, the abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Browning Mfg. v. Mims* (*In re Coastal Plains, Inc*.), 179 F.3d 197, 205 (5th Cir. 1999) (quotation omitted).

The threshold question is whether the trustee could legally sell the claims. The bankruptcy court held that it could not and approved the proposed compromise on the basis that continued litigation offered little promise for the estate.

Cadle argues it can purchase the claims from the trustee and pursue them at its own risk and expense, paying the estate immediately for that right. It thus contends that the court's analysis was in error because it failed to consider the sale alternative.

As a general matter, a trustee may sell causes of action belonging to the estate. Section 363 of the Bankruptcy Code governs the sale, use, or lease of property of the estate, allowing the trustee to sell "property of the estate," other

No. 09-10604

than in the ordinary course of business, after notice and a hearing. 11 U.S.C. § 363(b)(1). Section 541 defines "property of the estate" to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "[T]he term 'all legal and equitable interests of the debtor in property' is all-encompassing and includes rights of action as bestowed by either federal or state law."[2] A trustee may sell litigation claims that belong to the estate, as it can other estate property, pursuant to § 363(b).[3]

We now turn to whether the trustee may sell the particular claims in this case to Cadle. A trustee may sell only assets that are property of the estate. *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). Cadle sought to purchase its original state law action from the trustee. In that action, it asserted claims of alter ego (reverse veil-piercing) and fraudulent conveyance; it also requested a constructive-trust remedy.

## A. The Alter Ego Claims.

We have previously addressed whether alter ego claims brought by a creditor under Texas state law are property of the estate within the meaning of § 541. *S.I. Acquisition*, 817 F.2d at 1152-53. We identified as operative the question "whether a [debtor] corporation could assert an action against itself based upon alter ego." *Id.* at 1152. We recognized that alter ego claims are typically asserted by the debtor's creditors but noted that "theoretically nothing in Texas

---

[2] *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S.I. Acquisition, Inc.*), 817 F.2d 1142, 1149 (5th Cir. 1987) (citing *Am. Nat'l Bank v. MortgageAmerica Corp.* (*In re MortgageAmerica Corp.*), 714 F.2d 1266, 1274 (5th Cir. 1983)).

[3] *See, e.g., Simantob v. Claims Prosecutor, LLC* (*In re Lahijani*), 325 B.R. 282, 287 (B.A.P. 9th Cir. 2005) ("Causes of action owned by the trustee are intangible items of property of the estate that may be sold."); *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 230 & n.25 (S.D. Ohio 2008).

No. 09-10604

law prohibits a corporation from asserting on its own an action based on alter ego and that in fact the underlying policy of the remedy supports this conclusion." *Id.* at 1153. We therefore held that the alter ego action brought by the creditor in fact belonged to the debtor and was property of the estate within the meaning of § 541(a)(1). *Id.*

Our decision in *S.I. Acquisition* alone, however, does not necessarily resolve the question whether the alter ego claims brought by Cadle actually belong to the estate. That case dealt with a traditional veil-piercing claim, whereby a creditor attempts to hold liable a debtor-corporation's shareholders or its affiliated entities for the obligations of the debtor-corporation. Here, by contrast, Cadle has brought a *reverse* veil-piercing claim that seeks to hold Brunswick and JHM liable for the acts of the individual debtor, Moore.

We have previously held that distinction to be one without a difference. In *Schimmelpenninck v. Byrne* (*In re Schimmelpenninck*), 183 F.3d 347, 358 (5th Cir. 1999), we found error in the judgments of the bankruptcy and district courts that "a creditor's action based on reverse-piercing of a corporate veil does not constitute property of the bankruptcy estate," *id.* at 365, and we concluded that the "reverse-piercing action belongs to the [trustee], not to one individual creditor of the Debtor," *id.* at 366. We recognize the tension between the rule and its application: A reverse veil-piercing claim, unlike a traditional veil-piercing claim, does not allege harm to the debtor.[4] Our decisions in *S.I. Acquisition* and *Schimmelpenninck* nevertheless control as to the alter ego claims: Those claims are property of the estate,[5] so the trustee may sell them to Cadle pursuant to

---

[4] *See Southmark Corp. v. Crescent Heights VI, Inc. (In re Southmark Corp.)*, 95 F.3d 53 (5th Cir. 1996) (per curiam) (unpublished) (table), 1996 WL 459958, at *6-*7 (reasoning that allowing "the very party that abused [the corporate form] in the first place" to bring a reverse veil-piercing action "would seem to disserve [the] purpose" of the equitable remedy).

[5] Although the holding in *Schimmelpenninck* is in the alternative, "[a]lternative
(continued...)

7

No. 09-10604

§ 363(b).

## B. The Fraudulent-Transfer Claims

Whether an action brought under state law belongs to the estate under § 541(a)(1) depends on whether the debtor could have brought that action at the commencement of the case.[6] At least one of our decisions reads *MortgageAmerica* broadly to hold that fraudulent-transfer claims brought under Texas law are property of the estate under § 541(a)(1).[7]

That reading of *MortgageAmerica* conflicts with *S.I. Acquisition*:

> In addressing the Fraudulent Transfer action, we held that under Texas law this cause of action was assertable only by a creditor and did not belong to the debtor corporation [citing *Mortgage-America*, 714 F.2d at 1272-73]. Even though this claim therefore could not be treated like the other two actions, [which we held to be property of the estate,] we nevertheless held that it also was stayed pursuant to section 362(a)(3). Our reasoning was that while the defendant in the state court action was not the debtor, but a control person of the debtor, the creditor's suit sought to recover property of the debtor's estate.

*S.I. Acquisition*, 817 F.2d at 1150.[8]

_____

[5] (...continued)
holdings are binding precedent." *Pruitt v. Levi Strauss & Co.*, 932 F.2d 458 (5th Cir. 1991) (per curiam).

[6] *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008); *S.I. Acquisition*, 817 F.2d at 1152; *MortgageAmerica*, 714 F.2d at 1275-77.

[7] *See Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1285-86 & n.5 (5th Cir. 1994) (deciding that fraudulent-transfer conspiracy claims were property of the estate (citing *MortgageAmerica*, 714 F.2d at 1275)); *see also In re Bradley,* 326 F. App'x 838, 839 (5th Cir. 2009) (per curiam) ("[A] claim that would ordinarily be brought by creditors nonetheless belongs to the debtor's estate if it pursues property in which the debtor retains an equitable interest." (citing *MortgageAmerica*)).

[8] *See also Seven Seas*, 522 F.3d at 588 (citing *S.I. Acquisition*, 817 F.2d at 1150) (distinguishing between claims that belong to the debtor and those that seek to recover estate prop-
(continued...)

8

No. 09-10604

Our decision in *Educators* nevertheless controls, because the above discussion in *S.I. Acquisition* is *dictum*.[9] Thus, under our precedent, the Texas fraudulent-conveyance actions are property of the estate under § 541(a)(1) that the trustee may sell to Cadle.[10] Yet we hesitate to rest our decision entirely on that basis, because of the conflict between *Educators* and *S.I. Acquisition* and because of the tension between that result and the general rule that an action belongs to the estate under § 541(a)(1) only if the debtor could have brought that action at the commencement of the case. [11]

But § 541(a)(1) is not the only provision under which property may become property of the estate. Although that section often provides the bulk of estate

---

[8] (...continued)
erty from a third-party).

[9] In *Educators*, 25 F.3d at 1285-86, we faced and decided the question whether fraudulent-transfer claims brought under Texas law were property of the estate under § 541(a)(1). That decision's reliance on *MortgageAmerica* was essential to its holding. *See Educators*, 25 F.3d at 1285 n.5. In *S.I. Acquisition*, by contrast, the issue was whether alter ego claims brought under Texas law could have been brought by the debtor and therefore belonged to the estate. The court observed that "construction of [*MortgageAmerica*] is crucial to resolving this appeal," 817 F.2d at 1148 and launched into a thorough examination of the decision, including a discussion of claims brought under the Texas Fraudulent Transfer Act. But the fraudulent conveyance discussion was not relevant to the holding in *S.I. Acquisition*. Rather, it served to clarify that the Code's automatic stay applies to causes of action that seek to recover estate property held or controlled by a third party in addition to actions that belong to the debtor.

[10] These are not § 548 claims. The petition was filed in May 2006. The allegedly fraudulent transfers occurred between 1997 and 2002. The trustee could not avoid those transfers by relying on § 548, because of that provision's two-year limitations period. Only through the Texas Fraudulent Transfers Act and its attendant four-year limitations period could the trustee challenge these transfers. *Compare* TEX. BUS. & COMM. CODE ANN. § 24.010(a)(1) *with* 11 U.S.C. § 548(a)(1).

[11] *See S.I. Acquisition*, 817 F.2d at 1150 (stating that fraudulent conveyance actions are "assertable only by a creditor and [do] not belong to the debtor" (citing *MortgageAmerica*, 714 F.2d at 1272 ("An action under the Texas [Fraudulent Transfers] Act, for our purposes, does appear to be assertable only by a debtor's creditors."))). *See also Seven Seas*, 522 F.3d at 589 & n.9 ("It is normally the debtor's creditors, and not the debtor itself, that have the right to assert a fraudulent transfer claim outside of bankruptcy, but in bankruptcy such a claim is usually brought by the trustee, for the benefit of all creditors. This is because the claim is really seeking to recover property of the estate.") (citing *MortgageAmerica*, 714 F.2d at 1272).

assets and thus is the focus of "property of the estate" analysis, the trustee's avoidance powers, allow the trustee to enlarge the property of the estate after commencement of the case. *See Gaudet v. Babin (In re Zedda)*, 103 F.3d 1195, 1201 (5th Cir. 1997). "The relationship between property of the estate under § 541 and the strong-arm powers of [§ 544] is one of the most important and least appreciated in all of bankruptcy law. . . . Too often lawyers focus exclusively on § 541 and forget that § 544 does much of the work." DOUGLAS G. BAIRD, ELEMENTS OF BANKRUPTCY 125 (4th ed. 2006).

Central to this bankruptcy is the trustee's power under § 544(b), which allows him to succeed to the actual, allowable and unsecured claims of the estate's creditors. *See* 11 U.S.C. § 544(b). If an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and "avoid" the debtor's transfer. Although the cause of action belonged to one creditor, any property the trustee recovers becomes estate property and is divided *pro rata* among all general creditors.[12] The trustee may recover the full extent of the fraudulently transferred property on the basis of one creditor's claim. *Moore v. Bay*, 284 U.S. 4 (1931). "In other words, an entire transfer may be set aside even though the creditor's claim is nominal." 5 COLLIER ON BANKRUPTCY ¶ 544.09[5] (15th ed. rev. 2009).

The trustee's successor rights arise under federal law, but the extent of those rights depends entirely on applicable state law. That distinction creates important differences between fraudulent transfer actions brought under § 544(b) and those pursued under § 548. For example, a four-year limitations

---

[12] *See* 11 U.S.C. § 541(a)(3) (stating that property of the estate includes "[a]ny interest in property that the trustee recovers under section . . . 543, 550, 553, or 723 of [the Code]"); *see also id.* § 550(a) (providing that "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b) or 724(a) of [the Code], the trustee may recover, for the benefit of the estate, the property transferred").

No. 09-10604

period applies to fraudulent transfer actions brought under Texas law, whereas the § 548 reachback period is limited to two years. *Compare* TEX. BUS. & COMM. CODE ANN. § 24.010(a)(1) *with* 11 U.S.C. § 548(a)(1).

Cadle is an actual unsecured creditor that brought fraudulent-conveyance claims against defendants under Texas law before commencement of the bankruptcy. Because those claims sought to recover estate property, the automatic-stay provisions of § 362(a)(3) barred Cadle from pursuing the fraudulent-transfer claims individually once the petition was filed. *See MortgageAmerica*, 714 F.2d at 1275. At the same time, the trustee stepped into Cadle's shoes under § 544(b) and assumed control of the claims for the benefit of all general creditors.

The question we must next address is whether, by operation of § 544(b), those fraudulent-transfer claims became property of the estate that may be sold. A split of authority exists as to whether the trustee may sell causes of action that arise from his avoidance powers.[13]

We focus narrowly on the trustee's ability to sell causes of action that he has inherited from creditors under § 544(b)––causes of action that exist independent of the bankruptcy proceeding. "It is well established that a claim for fraudulent conveyance is included within . . . [estate] property."[14] "[T]he right to re

---

[13] *Compare Lahijani*, 325 B.R. at 288 ("[T]he Ninth Circuit permits such actions to be sold or transferred." (citing *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774, 781 (9th Cir. 1999); *Briggs v. Kent (In re Prof'l Inv. Props. of Am.)*, 955 F.2d 623, 625-26 (9th Cir. 1992))); *with Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 242 (3d Cir. 2000). We do not address the broader question whether a trustee may sell all chapter 5 avoidance powers, such as the power to avoid preferences under § 547 or to avoid fraudulent transfers under § 548. A sale of § 544(b) actions is nothing more than a sale of the trustee's right to bring state law claims existing outside of bankruptcy, which is analogous to the trustee's existing power to assign chapter 5 avoidance actions to creditors.

[14] *Morley v. Ontos, Inc. (In re Ontos, Inc.)*, 478 F.3d 427, 431 (1st Cir. 2007) (§ 544 claims) (citation omitted); *cf. Sherk v. Tex. Bankers Life & Loan Ins. Co. (In re Sherk)*, 918 F.2d 1170, 1176-77 (5th Cir.1990) ("[T]he Bankruptcy Code indicates that [§ 548] claims for fraudulent transfer of the debtor's property belong to the trustee and are property of the estate."), *ab-*
(continued...)

11

coup a fraudulent conveyance, which outside of bankruptcy may be invoked by a creditor, is property of the estate that only a trustee or debtor in possession may pursue once a bankruptcy is under way." *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708-09 (7th Cir. 1994). Although fraudulent-transfer claims under Texas state law could not be brought by the debtor, *MortgageAmerica*, 714 F.2d at 1272, such claims become estate property "once bankruptcy is under way" by virtue of the trustee's successor rights under § 544(b), *Havlik*, 20 F.3d at 708-09. The trustee may therefore sell these state law fraudulent-conveyance actions back to Cadle.[15]

Allowing a trustee to sell § 544(b) rights of action is in accord with the trustee's existing powers. In chapter 11 cases, for instance, "a party other than the debtor or the trustee may be authorized by a plan of reorganization to exercise avoidance powers." *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir. 1995). Outside the context of a reorganization plan, we have consistently recognized that a single creditor may bring a chapter 5 avoidance action on behalf of the trustee after court approval.[16] The Bankruptcy Code permits an individual creditor to pursue a fraudulent-conveyance action, for the benefit of the estate, in the name of the trustee but at the creditor's own risk and expense.[17]

---

[14] (...continued)
*rogated on other grounds*, *Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992).

[15] *See Lahijani*, 325 B.R. at 288 ("Causes of action that exist independent of bankruptcy are commonly sold by bankruptcy trustees under § 363(b).").

[16] *City of Boerne v. Boerne Hills Leasing Corp. (In re Boerne Hills Leasing Corp.)*, 15 F.3d 57, 60 (5th Cir. 1994) (chapter 7); *Lilly v. FDIC (In re Natchez Corp.)*, 953 F.2d 184, 187 (5th Cir. 1992)*; City of Farmers Branch v. Pointer (In re Pointer)*, 952 F.2d 82, 88 (5th Cir. 1992).

[17] 11 U.S.C. § 503(b)(3)(B); *see also Lahijani*, 325 B.R. at 288 n.10; *Arab Monetary Fund v. Hashim (In re Hashim)*, 379 B.R. 912, 920-23 (B.A.P. 9th Cir. 2007) (reviewing the historical
(continued...)

No. 09-10604

Moreover, a sale of assets under § 363 requires notice and a hearing and is subject to court approval. *See Cont'l*, 780 F.2d at 1226. Courts will look to the trustee's articulated business justification or sound business reasons for the proposed sale. *Id*. Any sale of § 544(b) actions would therefore undergo careful judicial scrutiny pursuant to existing § 363(b) requirements.[18]

We conclude, therefore, that the fraudulent-transfer claims are property of the estate under § 541(a)(1) per *Educators*, 25 F.3d at 1285-86. In the alternative, the fraudulent-transfer claims became estate property under § 544(b) and––like other estate property––may be sold pursuant to § 363(b).[19]

The bankruptcy court's ruling that the claims could not be sold was legal

---

[17] (...continued)
origins of the "creditor-recovery provision"). The Code grants that authority subject to two conditions. The first is that the creditor recover property for the benefit of the estate. The second is that the creditor obtain court approval, arguably as early as the date of filing, but certainly no later than the time of recovery. *See id*. at 922. Cadle did not move the bankruptcy court for such authorization.

[18] The sale of § 544(b) actions will not necessarily undermine core bankruptcy principles. In approving such sales, bankruptcy courts must ensure that fundamental bankruptcy policies of asset value maximization and equitable distribution are satisfied. Bankruptcy courts must make those decisions on a case by case basis in light of the factual circumstances.

Concerns that a creditor may recover more than its *pro rata* share of assets by purchasing a § 544(b) action are mitigated where that creditor represents the vast majority of all outstanding claims. Certainly no such issues arise where a single creditor holds the entirety of estate claims. Cadle's claims represent 86% of the unsecured debt.

[19] The purchase offer need not necessarily promise a percentage of future recovery to the estate. A set price offer provides "benefit to the estate" in the form of the sale price, which becomes part of the estate assets. *See Lahijani*, 325 B.R. at 288. Bankruptcy courts may determine, in any given situation, whether a sum-certain offer maximizes estate assets or whether, instead, an offer that includes a portion of future recoveries is more appropriate.

In the present case, the bankruptcy court expressed serious misgivings as to the value of these claims and announced dim prospects for their success. Yet it refused to consider Cadle's offer, because it did not include a percentage of future recoveries for the estate. That offer exceeded defendants' by $12,500. Given the court's assessment, it valued the prospect of any future recovery at nearly zero, and Cadle's offer could have maximized the value of the claims to the estate.

error, and its approval of the proposed settlement was an abuse of discretion. The court's failure to consider the consequences to the estate of a sale was also an abuse of discretion.[20]

## C. The Constructive-Trust Remedy.

"Under Texas law, a constructive trust is . . . an equitable remedy imposed by law to prevent unjust enrichment resulting from an unconscionable act." *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 436 (5th Cir. 1994). A constructive trust is not a cause of action under Texas law. The constructive-trust remedy is appropriate on a showing of actual fraud or breach of a confidential or fiduciary relationship. *Id*. at 436-37 (citations omitted). "The burden of establishing the existence of the constructive trust rests on the claimant, as does the burden of identifying and tracing the trust property." *Id*. at 436 (citations omitted).

If Cadle had demonstrated its entitlement to a constructive trust in the disputed properties by the time Moore filed for bankruptcy, those properties would belong exclusively to Cadle and would not be subject to *pro rata* distribution among all estate creditors. *Id*.; *see also* 11 U.S.C. § 541(d). But that did not occur; at the filing of the petition, Cadle and the defendants had only filed cross-motions for summary judgment. The constructive-trust remedy is therefore intertwined with the alter ego and fraudulent-transfer claims. Like the underlying claims, that remedy belongs to the estate. Cadle may thus acquire the constructive-trust remedy if it successfully purchases the underlying causes of action.

---

[20] *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 440-41 (1980) (holding that bankruptcy court abused its discretion by failing to consider whether alternatives were preferable to proposed settlement).

No. 09-10604

### III.

Whether a trustee's proposed compromise of estate claims can constitute a proposed sale of estate property that triggers § 363 sale provisions is an issue of first impression in this circuit. The bankruptcy court's power to approve a proposed settlement or "compromise" of the estate's claims arises under rule 9019 of the Federal Rules of Bankruptcy Procedure. A proposed settlement must be "fair and equitable" and in the best interests of the estate. *Am. Can Co. v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 605, 608 (5th Cir. 1980). Five factors inform the "fair and equitable" analysis: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors and a proper deference to their respective views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise. *See Foster Mort.*, 68 F.3d at 917-18.

A sale of assets under § 363, as implemented by rule 6004, requires notice and a hearing and is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons. *See Cont'l*, 780 F.2d at 1226. A trustee has the duty to maximize the value of the estate. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 353 (1985). As a general matter, the trustee must demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a lower bid in the presence of sound business reasons, such as substantial doubt that the higher bidder can raise the cash necessary to complete the deal. 3 COLLIER ON BANKRUPTCY ¶ 363.02[1][f] (15th ed. rev. 2009).

We must decide whether Cadle's overbid required the bankruptcy court to

No. 09-10604

scrutinize the proposed compromise under § 363 and rule 6004, in addition to rule 9019(a). The issue has given rise to a circuit split:

> The cases are mixed [] on whether the settlement of a claim that the estate owns is a sale (that is, disposition) of property of the estate [citing *Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l Inc.)*, 136 F.3d 45 (1st Cir. 1998) (deciding that settlement is not a sale), *Goodwin v. Mickey Thompson Entm't Group, Inc.* (*In re Mickey Thompson Entm't Group, Inc.*), 292 B.R. 415 (B.A.P. 9th Cir. 2003) (stating that settlement is a sale); *In re Dow Corning Corp.*, 198 B.R. 214 (Bankr. E.D. Mich. 1996) (same)]. The point may be academic for purposes of whether court approval is required, because Rule 9019 requires notice and a hearing and court approval of settlements, independent of section 363(b)(1). However, there may be other consequences, such as . . . whether overbids are permitted. [citing *Mickey Thompson*].

3 COLLIER ON BANKRUPTCY, *supra*, ¶ 363.02.

The trustee argues that a bankruptcy court need not consider overbids, because a proposed settlement amount need only be "reasonable." Cadle urges that the court should have considered an auction of these claims in light of its higher offer. It asks us to adopt the reasoning of *Goodwin v. Mickey Thompson Entertainment Group, Inc.* (*In re Mickey Thompson Entertainment Group, Inc.*), 292 B.R. 415 (B.A.P. 9th Cir. 2003). Under nearly indistinguishable factual circumstances, that court held as follows:

> When confronted with a motion to approve a settlement under Rule 9019(a), a bankruptcy court is obliged to consider, as part of the "fair and equitable" analysis, whether any property of the estate that would be disposed of in connection with the settlement might draw a higher price through a competitive process and be the proper subject of a section 363 sale.

*Id.* at 421-22.

The First Circuit has held, without analysis, that a settlement is not a sale. *See Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45

No. 09-10604

(1st Cir. 1998). That decision represents the less defensible side of the circuit split. Courts in the Third, Sixth, and Seventh Circuits, in addition to the *Mickey Thompson* court, have taken the position that a settlement may trigger § 363 requirements.[21] In *Dow Corning*, 198 B.R. at 222 n.7, the court held that the settlements at issue were the same as a sale of assets under §363(b). In *Telesphere*, 179 B.R. at 552 n.7, the court stated, "The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim."

The Collier treatise has sided with *Mickey Thompson* and other courts that have construed settlements as the equivalent of the sale of estate assets:

> Compromises of Estate Claims Which Should Have Been Noticed as a Sale
>
> A compromise of a claim of the estate is in essence the sale of that claim to the defendant. In most compromises, the procedures of Rule 6004 and the substance of Code section 363 will not be implicated. However, if other parties indicate that they are willing to pay more for the claim, or if it is otherwise shown that a bidding procedure would be appropriate, then the trustee must proceed under section 363 and procedures described herein [citing *Mickey Thompson*].

10 COLLIER ON BANKRUPTCY, *supra*, ¶ 6004.01.

We adopt the reasoning of *Mickey Thompson*. The proposed compromise was a disposition of estate property. Cadle's higher offer obligated the bankruptcy court to consider whether an auction and § 363 sale were appropriate. "Whether to impose formal sale procedures is ultimately a matter of discretion" that we leave to bankruptcy courts. *Mickey Thompson*, 292 B.R. at 422.

The trustee points out that Brunswick has agreed to waive its $12 million

---

[21] *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 394-95 (3d Cir. 1996) (determining that settlement agreement "compromised an asset of the debtors' estate" that triggered § 363); *Nicole*, 385 B.R. at 230 (holding that a settlement is an asset sale and applying § 363); *In re Dow Corning Corp.*, 198 B.R. 214, 247 (Bankr. E.D. Mich. 1996); *In re Telesphere Commc'ns*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994).

indemnity claim against the estate as a part of the proposed settlement. The trustee argues that the proposed settlement is therefore a true compromise, unlike the situation in *Mickey Thompson*.[22] Brunswick's indemnity claim is a contingent claim that would be triggered only if the reverse veil-piercing claims against it were to prevail. That would not occur, however, unless it were shown that Brunswick and Moore are the same entity.

The merits of the indemnity claim are not before us, so we do not express any opinion as to whether Brunswick can hold an indemnity claim against itself. On remand, the bankruptcy court should compare the value to the estate of the release of that claim, if any, against the value of Cadle's higher bid. Bankruptcy courts should not allow defendants to settle estate claims at a discount and avoid § 363 scrutiny by filing large, frivolous claims against the estate.[23] In any event, there is no logical reason why Cadle cannot assume the liability of that indemnity claim as a part of its bid for the alter-ego action.

Cadle's $50,000 bid was indeed a "substantial offer."[24] Moreover, "entertaining overbids often triggers a bidding sequence that may lead to a much higher price." *Mickey Thompson*, 292 B.R. at 422. Because the bankruptcy court did not entertain Cadle's offer and did not hold an auction, the true value of the claims is undetermined.

The trustee's administrative expenses are also unknown, though Cadle has

---

[22] *See Mickey Thompson*, 292 B.R. at 422 n. 7 ("Functionally, there was no compromise at all. Trustee simply attempted to sell to prospective defendants for $40,000 his cause of action against them.").

[23] Even if Brunswick's indemnity claim is legally viable, its value would be limited to Brunswick's maximum exposure in the alter-ego action. No one has ever valued that action at $12 million; Cadle's most optimistic estimates value it at no more than $2 million.

[24] Concerns about *why* Cadle is willing to pay what it is willing to pay are irrelevant to the analysis, the proper focus of which is maximization of the estate's assets. Similarly irrelevant are concerns about the viability of reverse veil-piercing claims under Texas law. Cadle has offered to bear those risks.

already paid the trustee's attorneys' fees. Thus it remains to be seen what the estate will recover from a sale or compromise of these claims. It certainly cannot be presumed that any sale price, no matter the amount, will fail to translate to more money for the estate.

On remand, the bankruptcy court must afford proper deference to the views of Cadle, as the estate's majority creditor and the only creditor to take an interest in the claims.[25] Our caselaw recognizes the paramount interest of creditors and requires deference to their reasonable views concerning proposed settlements. *Jackson Brewing*, 624 F.2d at 609. "[A] bankruptcy court may not ignore creditors' overwhelming opposition to a settlement." *Foster Mort.*, 68 F.3d at 918. In a "no-asset" case such as this, litigation claims represent the last prospect of recovery for the estate. After paying over $60,000 to the trustee's attorneys to prepare the case for trial, Cadle had every reason to demand that the trustee maximize the value of the claims through an auction.

If the bankruptcy court were to upset the proposed settlement in the interest of maximizing the value of estate assets, it would not work an injustice on defendants. "Everyone who deals with a bankruptcy trustee in a transaction that is not in the ordinary course of business is charged with the knowledge that the law may require court approval . . . ." *Mickey Thompson*, 292 B.R. at 421. A proposed settlement may bind the parties, but it does not bind the courts; otherwise, the approval process would be meaningless.

In the event an auction is held and the trustee selects defendants' offer, the bankruptcy court must assess the transaction as both a proposed sale under

---

[25] Although Brunswick has filed a contingent claim, its interests are directly adverse to those of all other creditors in this matter. Brunswick's best interest is to minimize the value of these claims. The bankruptcy court should not afford any weight to Brunswick's views as a creditor unless and until it has determined the likely merit of Brunswick's indemnity claim.

No. 09-10604

§ 363 and a proposed compromise under rule 9019.[26] Procedures under that rule would not be invoked, however, were the trustee to accept Cadle's bid, because the transaction would not constitute a proposed settlement.

IV.

In summary, the claims at issue are assets of the estate that can be sold to Cadle. The bankruptcy court's decision to the contrary was an error of law and therefore an abuse of discretion. We adopt *Mickey Thompson*. The proposed settlement was a disposition of estate assets, and Cadle's overbid required the court to consider the appropriateness of an auction and § 363 sale procedures. Its failure to consider those alternatives was also an abuse of discretion.

On remand, the bankruptcy court must determine whether the claims are the proper subject of an auction and § 363 sale. In reaching that decision, it should analyze the merit of Brunswick's indemnity claim.

The judgment of the district court, affirming the decisions of the bankruptcy court, is REVERSED, and this matter is REMANDED to the district court for further proceedings not inconsistent with this opinion.

---

[26] *See, e.g.*, *Nicole*, 385 B.R. at 237 (holding that a proposed settlement of claim with defendant, whose offer presented the only bid in auction, should be reviewed under § 363 and rule 9019); *see also Mickey Thompson*, 292 B.R. at 421.