# United States Court of Appeals
## For the First Circuit

No. 18-2001

IN RE: TELEXFREE, LLC; TELEXFREE, INC.; TELEXFREE FINANCIAL, INC.,

Debtors.

STEPHEN DARR, as Trustee of the Estates of TelexFree, LLC, TelexFree, Inc., and TelexFree Financial, Inc.,

Plaintiff, Appellee,

v.

RITA DOS SANTOS, individually and as putative class representative; MARIA MURDOCH, individually and as putative class representative; ANGELA BATISTA-JIMENEZ, individually and as putative class representative; ELISANGELA OLIVEIRA, individually and as putative class representative; DIOGO DE ARAUGO, individually and as putative class representative,

Defendants,

PLAINTIFFS' INTERIM EXECUTIVE COMMITTEE,

Interested Party, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Robert J. Bonsignore, with whom Lisa Sleboda, Bonsignore Trial Lawyers, PLLC, William R. Baldiga, James W. Stoll, and Brown Rudnick LLP were on brief, for Appellant.

Harold B. Murphy, with whom Charles R. Bennett, Jr., Andrew G. Lizotte, Shawn Lu, and Murphy & King, P.C. were on brief, for Appellee.

October 29, 2019

**LYNCH**, **Circuit Judge**.  This appeal is from bankruptcy court orders adopted by the district court arising out of the bankruptcies of TelexFree, LLC; TelexFree, Inc.; and TelexFree Financial, Inc. (collectively, "TelexFree"), one of the largest Ponzi/pyramid schemes in U.S. history.  The dispute in this case is over who will be allowed to seek to recover payments made by new participants in the scheme to the existing participants who recruited them (the "Contested Funds").  Trustee Stephen Darr is attempting to recoup these Contested Funds through avoidance actions, while victims represented by the Plaintiffs' Interim Executive Committee ("PIEC") are asserting unjust enrichment claims to recover the same sums.

Adopting the bankruptcy court's analysis, the district court stayed the unjust enrichment claims under 11 U.S.C. § 362(a)(3) based on the following findings:
(1) that the trustee has standing to bring the avoidance actions because the Contested Funds were "interests of the debtor in property" under 11 U.S.C. §§ 547 and 548;
(2) that these avoidance actions were themselves "property of the estate" under 11 U.S.C. § 541; and
(3) that the unjust enrichment claims were acts to "obtain" or "control" property of the estate (i.e., the avoidance actions) -- and thus barred by 11 U.S.C. § 362(a)(3) -- because they are "derivative" of the avoidance actions under the analyses set forth

in the Second Circuit's Madoff cases.  See Picard v. Fairfield Greenwich Ltd. ("Madoff III"), 762 F.3d 199 (2d Cir. 2014); Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC) ("Madoff II"), 740 F.3d 81 (2d Cir. 2014). The net effect of these rulings was to permit the trustee to pursue the Contested Funds and to stop PIEC's efforts to pursue those funds.

We assess and reject the only arguments that the appellant makes as to why the bankruptcy court erred in ruling that their unjust enrichment claims are stayed pursuant to § 362(a)(3).  Those arguments, which we reject, are: (1) that the avoidance action claims are not "property of the estate" within the meaning of that stay provision because the bankruptcy court's "standing" finding is flawed; and (2) that, in any event, the unjust enrichment claims do not seek to "obtain" or "control" the "property of the estate" within the meaning of that stay provision because those claims are not "derivative" of the avoidance action claims under the derivative analyses the Second Circuit employed in the Madoff cases.

We affirm, write narrowly, and do not reach other arguments or potential arguments.  We describe below the facts and, more explicitly, the nature of the dispute between Darr and PIEC.

- 4 -

I.

A.   The TelexFree Scheme

TelexFree was a hybrid Ponzi and pyramid scheme that operated in the United States from 2012 until 2014, when its founders were criminally charged, its operations closed, and it declared bankruptcy.  It is considered one of the largest such schemes in U.S. history, with approximately $1.7 billion lost and one million participants, many of them immigrants, defrauded.

The material facts are not disputed by the parties. TelexFree held itself out as a multi-level marketing company that sold international phone subscription packages.  Participants paid membership fees to join the TelexFree scheme and have the right to sell phone subscription packages to others.[1]  Each participant, including new participants, was assigned an online user account by the company.  Many participants had multiple accounts, as they were encouraged to do by the economic incentives of the scheme. The participants, for bankruptcy purposes, later were divided into "Net Winners" and "Net Losers," important concepts which we explain below.

The actual phone subscriptions sold were tangential to TelexFree's true purpose, like all pyramid schemes.  TelexFree's

---

[1]    The phone subscription service offered by TelexFree allowed customers to make inexpensive calls to other countries using a technology called Voice over Internet Protocol ("VoIP") instead of a traditional phone line.

operations, rather, were geared towards recruiting new participants into the scheme. New participants, on signing up, owed a membership fee to TelexFree. Instead of paying TelexFree, new participants could pay the existing members directly, and the existing members could redeem some accumulated "credits" to settle the new members' obligations to TelexFree. New participants then themselves often recruited additional participants into the scheme. Participants who joined early in the scheme could make significant money from all the "downstream" participants, while many newer participants lost money, sometimes their entire life savings.

TelexFree combined these classic pyramid scheme features with the features of a classic Ponzi scheme. The company advertised that participants could receive guaranteed returns on the money they put into TelexFree, without ever having to sell a VoIP subscription package or even to sign up a new participant. To keep up the facade of a legitimate business, the company required participants to post commercially-useless internet advertisements.

For example, participants who joined the scheme through the "AdCentral Plan" paid TelexFree $339 -- a $50 membership fee and a $289 contract fee. In return, they were allowed to sell ten VoIP subscription packages (although they were not required to) and were required to post one internet advertisement a day. If

the participants met their advertising quota, they would earn the right to sell another VoIP subscription package each week. Or, instead of selling it, they could turn the extra VoIP subscription package back into TelexFree in exchange for twenty dollars' worth of credits. In that way, participants could reliably transform a $339 investment into $1,040, or a 207% annual rate of return. Other membership plans had even higher rates of return. This was not true compensation for labor but was instead an astronomical guaranteed return on investment, paid for by newer recruits' membership fees.

Ostensibly, there were three main ways to make money through the TelexFree scheme: selling phone subscription packages, posting internet advertisements, and signing up new participants. Often, TelexFree participants were not paid in cash directly but through digital "credits" that they, under the terms of their subscription contracts, could redeem for cash at a later point.[2]

The Contested Funds at issue relate to the signing up of new participants. When an existing participant recruited someone new into the scheme, TelexFree would send an invoice to the new participant for the membership fee. One way the new participant

---

[2] PIEC disputes whether participants regularly converted credits into cash, but PIEC concedes that participants were regularly paid commissions and bonuses in the form of credits and "it's conceivable" that at least some participants received cash payment from TelexFree.

could satisfy the invoice was by paying the company the membership fee directly, although only about twelve percent of membership fees were paid that way.

The much more common method used was that the new participant paid her membership fee directly to the participant who recruited her. TelexFree then would remove from the recruiting participant's account credits of equal value to the membership fee that this recruiting participant retained. TelexFree then considered the new participant's invoice satisfied and, once annually, issued an Internal Revenue Service Form 1099 to the recruiting participant for the value of the credits he redeemed. Existing TelexFree participants could monetize their accumulated credits this fast and reliable way.

The parties disagree about how to properly characterize these transactions. The bankruptcy and district courts adopted the trustee's characterization. The trustee characterizes this series of transactions as a single "triangular transaction." He argues that the payments made by the new participants to the recruiting participants were integral to the economics of the TelexFree scheme and are best understood as an indirect way for the new participants to pay TelexFree membership fees and TelexFree simultaneously to pay the recruiting participants for their accumulated credits. The concept of one "triangular transaction" was adopted by the bankruptcy court when it approved the net equity

formula, discussed below. It is that formula which the trustee will use to distribute estate assets to the TelexFree victims.

In contrast, PIEC characterizes the triangular transaction as three separate transactions. In its view, since the credits assigned to participants were fictitious and the entire scheme criminal, the bankruptcy court was required to look to only the so-called "participant-to-participant payments" between the new and recruiting participants when analyzing what was an "interest in property" of the debtor for purposes of both Darr's avoidance action claims and whether Darr has standing to recover the Contested Funds. In PIEC's view, the "victims" PIEC represents who want to exercise their "personal rights" against recruiters who "pocketed their hard-earned savings" were the persons harmed, not TelexFree. PIEC wants to recover the Contested Funds through its unjust enrichment claims, but it does not say it will prove its claims on an individual-by-individual basis. Rather, it seeks to prove its claims by reference to the fraudulent scheme.

B. Procedural History

When the scheme collapsed in 2014, TelexFree filed a voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code. Stephen Darr was appointed the trustee of the jointly administered estates on June 6, 2014.

Darr sought and received two initial rulings from the bankruptcy court: (1) that TelexFree was a Ponzi and pyramid

scheme, and (2) that a "net equity formula" should be used to calculate TelexFree victims' potential claims. The net equity formula, which the bankruptcy court approved on January 26, 2016, divides TelexFree participants into groups of "Net Winners" and "Net Losers." Only Net Losers will be creditors in the TelexFree bankruptcy cases.

Under the net equity formula adopted, the unredeemed credits assigned to participants' user accounts are disregarded, and all of a participant's user accounts are aggregated. Then, "the total amount a participant paid, whether to Telex[F]ree or to a recruiting participant, minus the amount of money that the participant received, whether from Telex[F]ree or a recruiting participant, results in the amount of the participant's claim." "Net Winners," then, are participants who paid less into the scheme than they got out, including through participant-to-participant payments. "Net Losers" are those who paid more into the scheme than they got out. Similar net equity formulas based on the same "net investment method" have been adopted in other Ponzi scheme cases. See Donell v. Kowell, 533 F.3d 762, 771-72 (9th Cir. 2008); Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC), 424 B.R. 122, 125 (Bankr. S.D.N.Y. 2010), aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229 (2d Cir. 2011).

In 2016, Darr filed two avoidance class actions in the bankruptcy proceedings against groups of foreign and domestic Net Winners, respectively, seeking to use preferential or fraudulent transfer theories under 11 U.S.C. §§ 547 and 548 (collectively, "Avoidance Actions").  Any recovery from these class actions will be ratably distributed to all Net Losers.

Separately, in 2014, putative classes of TelexFree victims, coordinated by PIEC, had initiated lawsuits against financial institutions, lawyers, leaders of the TelexFree scheme, and others.  Many of these lawsuits have been consolidated into multidistrict litigation ("MDL") pending in the U.S. District Court for the District of Massachusetts.  Darr did not initially object to these PIEC lawsuits, but did when two putative classes of Net Losers, led by Rita Dos Santos, Maria Murdoch, Elisangela Oliveira, and others (collectively, the "Defendants"), brought claims for unjust enrichment against the Net Winners of the scheme, also seeking to recover the Contested Funds.[3]

In an adversary proceeding in the U.S. Bankruptcy Court for the District of Massachusetts, Darr sought to enjoin the PIEC

---

[3]     The first action was originally filed in district court and was later consolidated into the MDL.  Plaintiffs in that action tried to amend the MDL's consolidated complaint to add a claim for unjust enrichment against the Net Winners.  The motion to amend was denied.  PIEC plaintiffs then filed a second action containing an unjust enrichment claims in district court, separate from the MDL.  The court overseeing the MDL stayed the second action as an attempt to circumvent his ruling denying the motion to amend.

- 11 -

Defendants, individually and as putative class representatives, from pursuing their unjust enrichment claims against the Net Winners. Darr argued that such a claim is an improper attempt to "control" property of the TelexFree estates in violation of the automatic stay imposed in bankruptcy proceedings by § 362(a) of the Bankruptcy Code. The U.S. District Court for the District of Massachusetts withdrew the reference of the adversary proceeding to the bankruptcy court but returned the proceeding to the bankruptcy court to draft "proposed findings of fact and conclusions of law."

PIEC moved for summary judgment against Darr, contending that it was not violating the automatic stay because Darr lacked standing to bring his Avoidance Actions since TelexFree, as a criminal enterprise, never had a property interest in the Contested Funds, in contrast to the Net Loser Defendants PIEC represents, who had suffered direct, particularized harm at the hands of Net Winners.

Darr filed a cross-motion for summary judgment, requesting a declaratory judgment that the Contested Funds are property of the estate and that PIEC's unjust enrichment claims violate the automatic stay, and, in addition or in the alternative, an injunction under § 105(a) of the Bankruptcy Code preventing PIEC from further prosecuting unjust enrichment claims against the Net Winners.

The bankruptcy court, on December 18, 2017, found that Darr, in his capacity as trustee of the TelexFree estates, has the requisite property interest under 11 U.S.C. §§ 547 and 548, rejecting PIEC's argument that the criminal nature of TelexFree's "business" and TelexFree's lack of actual possession of the funds meant Darr lacked standing to bring the Avoidance Actions. The court also found the Defendants' unjust enrichment claims are derivative of Darr's Avoidance Actions and barred by the automatic stay provision of the Bankruptcy Code. See 11 U.S.C. § 362(a)(3). The bankruptcy court recommended granting summary judgment for Darr, including permanently enjoining the Defendants from further prosecuting their claims. The district court adopted the bankruptcy court's proposed findings and entered summary judgment for Darr, including as to the injunctive relief.

PIEC appeals, arguing that the district court erred in adopting the bankruptcy court's proposed findings. PIEC makes the following three arguments, each of which it maintains is independently sufficient to require a reversal: (1) TelexFree cannot have had a property interest in the Contested Funds under §§ 547 and 548 because any such interest would arise from "unenforceable, illegal contract[s]" with participants; (2) even if a property interest theoretically could arise from illegal contracts, TelexFree did not have one because it never had "physical possession or valid legal control of [the] funds"; and

(3) the harm suffered by the Defendants was particularized to them and not derivative of Darr's Avoidance Actions, so the Defendants' claims against the Net Winners should not be enjoined or considered stayed.

## II.

The district court, as said, adopted the bankruptcy court's findings and conclusions and entered summary judgment. We review a district court's ruling on cross-motions for summary judgment de novo. Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 558-59 (1st Cir. 2010).

Because we reject PIEC's arguments, we affirm the district court's order. We hold that TelexFree had a property interest in the Contested Funds for purposes of 11 U.S.C. §§ 547 and 548, such that the trustee had standing to bring his Avoidance Actions. Darr's Avoidance Actions themselves are property of the estate for purposes of § 362(a)(3), the unjust enrichment claims are derivative of the Avoidance Actions, and the Defendants are impermissibly attempting to "obtain possession of" and/or "exercise control over property of the estate" in violation of the automatic stay. 11 U.S.C. § 362(a)(3).

A.   TelexFree Had an Interest in Property in the Contested Funds Sufficient To Give Darr Standing to Bring His Avoidance Actions

Sections 547 and 548 of the Bankruptcy Code allow Darr to recover certain "transfer[s] of an interest of the debtor in

- 14 -

property."   11 U.S.C. § 547(b); id. § 548(a)(1) (similar).[4]

"[I]nterest of the debtor in property" is not defined in either

_____

[4]     Section 547(b), governing preferential transfers, states:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may . . . <u>avoid any transfer of an interest of the debtor in property</u> --
>
>> (1) to or for the benefit of a creditor;
>>
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>>
>> (3) made while the debtor was insolvent;
>>
>> (4) made --
>>
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>>
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>>
>> (5) that enables such creditor to receive more than such creditor would receive if --
>>
>>> (A) the case were a case under chapter 7 of this title;
>>>
>>> (B) the transfer had not been made; and
>>>
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (emphasis added).

     Section 548(a)(1), governing fraudulent transfers, states, in relevant part:

> (a)(1) The trustee may avoid any <u>transfer</u>

- 15 -

section.  In Begier v. IRS, 496 U.S. 53, 58 (1990), the Supreme Court explained that "property," for purposes of avoidance actions such as Darr's, is "best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."  The Court then looked to § 541(a)(1) of the Bankruptcy Code for the definition of "property of the estate."  Id. at 59.

Section 541(a)(1) defines "property of the estate" as including "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  This includes property "wherever located and by whomever held," id. § 541(a), and both "tangible or intangible property," S. Rep. No. 95-989, at 82 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5868.  The section incorporates interests in property "made available to the estate by other provisions of the Bankruptcy Code," including in some instances "property in which

<hr/>

. . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily --

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

11 U.S.C. § 548(a)(1) (emphasis added).

- 16 -

the debtor did not have a possessory interest." United States v. Whiting Pools, Inc., 462 U.S. 198, 205 (1983). The definition of "transfer" is also broad and includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary." 11 U.S.C. § 101(54)(D).

Ordinarily, state law creates and defines the underlying property interests, see Butner v. United States, 440 U.S. 48, 55 (1979), but federal bankruptcy law determines whether those interests are "property of the estate," see Rine & Rine Auctioneers, Inc. v. Douglas Cty. Bank & Tr. Co. (In re Rine & Rine Auctioneers, Inc.), 74 F.3d 854, 857-58 (8th Cir. 1996).

We affirm the district court's finding that TelexFree had a property interest in the Contested Funds for the purposes of Darr's Avoidance Actions under both §§ 547 and 548, and therefore that Darr has standing to bring his claims. The bankruptcy court carefully evaluated the substance of the TelexFree scheme when it approved the trustee's net equity formula. The formula recognizes that membership fees paid directly to TelexFree -- in which TelexFree indisputably would have had a property interest -- are functionally the same as membership fees that were paid to recruiting participants as part of a triangular transaction. Where membership fees were paid directly to TelexFree, recruiting participants were compensated with credits which, according to the terms of the contract, they could redeem for cash at a later point

- 17 -

using money generated largely from membership fees.  In the triangular model, new participants gave their membership fees in cash directly to already-recruited participants.

In both situations, participants engaged in a system designed and implemented by TelexFree.  New participants knew, or should have known, that the recruiting participant was acting at TelexFree's behest and that the recruiting participant had no authority to let a new participant into the TelexFree scheme unilaterally.  On joining the scheme, the new participant received an invoice and user account from TelexFree.  Membership in the scheme was governed by a contract that TelexFree wrote.  The new participants would have never paid the recruiting participants but for TelexFree's promise that they could join the scheme.

PIEC argues that such a property interest cannot exist in a Ponzi scheme like TelexFree because the entire scheme, and any contracts made pursuant to it, are fraudulent and therefore void ab initio.  The court, it argues, should not enforce an illegal contract or treat any part of the Ponzi scheme as legitimate.

This argument fails here.  The individual transactions that make up the triangular transaction at the heart of this case under the relevant state law are at most voidable, not void.  The bankruptcy court correctly recognized that under Nevada, Massachusetts, and many other states' laws, fraud in the inducement

merely renders a contract voidable.[5]  Proposed Findings of Fact and Conclusions of Law, <u>Darr</u> v. <u>Dos Santos</u>, No. 15-04055 (Bankr. D. Mass. Dec. 18, 2017), ECF No. 98 at 18-19 (citing <u>Bishop</u> v. <u>Stewart</u>, 13 Nev. 25, 42 (1878); <u>Shaw's Supermarkets, Inc.</u> v. <u>Delgiacco</u>, 575 N.E.2d 1115, 1117 (Mass. 1991)).  And it is undisputed that none of the participants attempted to void their membership with TelexFree pre-petition.

In <u>In re Ogden</u>, the Tenth Circuit concluded, as we do here, that a debtor operating a Ponzi scheme has a property interest in the form of defeasible, or voidable, title in funds that were obtained fraudulently from an investor, notwithstanding the underlying fraud.  <u>Bailey</u> v. <u>Big Sky Motors, Ltd.</u> (<u>In re Ogden</u>), 314 F.3d 1190, 1197-98 (10th Cir. 2002) (applying Utah law).  Other cases conclude the same.[6]  TelexFree's particular hybrid business model was unusual, but as the Second Circuit recognized in <u>In re Bernard L. Madoff Investment Securities LLC</u>

---

[5]     "[W]hen the result in a case will not be affected by the choice of law, an inquiring court, in its discretion, may simply bypass the choice."  <u>Lexington Ins. Co.</u> v. <u>Gen. Accident Ins. Co. of Am.</u>, 338 F.3d 42, 46 (1st Cir. 2003).  That is appropriate here, where the parties have not objected to the choice of law.

[6]     See <u>Merrill</u> v. <u>Allen</u> (<u>In re Universal Clearing House Co.</u>), 60 B.R. 985, 994-97 (D. Utah 1986); <u>Guttman</u> v. <u>Fabian</u> (<u>In re Fabian</u>), 458 B.R. 235, 259-60 (Bankr. D. Md. 2011), <u>aff'd</u>, 475 B.R. 463 (D. Md. 2012), <u>aff'd sub nom.</u> <u>Fabian</u> v. <u>Guttman ex rel. Strategic Partners Int'l, Inc.</u>, 491 F. App'x 420 (4th Cir. 2012) (per curiam); <u>Dicello</u> v. <u>Jenkins</u> (<u>In re Int'l Loan Network, Inc.</u>), 160 B.R. 1, 11 (Bankr. D.D.C. 1993).

- 19 -

("<u>Madoff I</u>"), 654 F.3d 229, 238 n.7 (2d Cir. 2011), fraud comes in many forms.

The district court also correctly rejected the argument that the doctrine of <u>in pari delicto</u> supports PIEC's position that the scheme precluded TelexFree obtaining a valid property interest. <u>In pari delicto</u> is "[t]he principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." <u>In pari delicto doctrine</u>, <u>Black's Law Dictionary</u> (11th ed. 2019). PIEC urges us not to "lend [our] good offices to mediating disputes among wrongdoers." <u>Nisselson</u> v. <u>Lernout</u>, 469 F.3d 143, 151 (1st Cir. 2006) (quoting <u>Bateman Eichler, Hill Richards, Inc.</u> v. <u>Berner</u>, 472 U.S. 299, 306 (1985)).

Certainly, <u>in pari delicto</u> may sometimes be asserted as an affirmative defense against a bankruptcy trustee. <u>See</u> <u>id.</u> at 153; <u>see also</u> <u>Official Comm. of Unsecured Creditors of PSA, Inc.</u> v. <u>Edwards</u>, 437 F.3d 1145, 1151 (11th Cir. 2006) (collecting cases). But we hold that <u>in pari delicto</u> doctrine does not defeat Darr's standing to bring avoidance actions.

PIEC advances a distorted definition of Net Winners to argue that <u>in pari delicto</u> bars TelexFree and its participant victims from engaging as "co-conspirators to a massive fraud." They define "Net Winners" as any participant who got more in <u>participant-to-participant payments</u> than that person gave out. That definition was properly rejected by the bankruptcy court. It

- 20 -

is also inconsistent with the net equity formula that the court did approve, which includes payments from TelexFree as well as other participants when calculating who is a Net Winner. Many of the recruiting participants are themselves victims of the scheme.

Further, PIEC mistakenly relies on the principle that "a trustee in bankruptcy cannot and does not acquire rights or interests superior to, or greater than, those possessed by the debtor." Nisselson, 469 F.3d at 153. For the reasons already explained, TelexFree had an interest in the Contested Funds.

PIEC separately argues that a defeasible property interest cannot be created in a Ponzi scheme without the debtor having physical possession of the funds.[7] As described above, the definition of interest in property for purposes of §§ 547 and 548 was intended by Congress to be broad. The text of §§ 547 or 548 does not say that physical possession is required. 11 U.S.C. §§ 547-548. To the contrary, it is clear the interest in property may include property "wherever located and by whomever held." Id. § 541(a). And that it includes intangible property. S. Rep. 95-989, at 82. This argument fails as well.[8]

---

[7] The bankruptcy court acknowledged that the debtor physically possessed the funds at issue in the cases cited by PIEC in which a court allowed a bankruptcy trustee to bring avoidance actions to recover transferred funds in a Ponzi scheme. None of those cases say that physical possession is a requirement; indeed, none of them involved facts raising the issue.

[8] Our understanding of the phrase "interest of the debtor in property" in §§ 547 and 548 accords with the purpose of

- 21 -

A contrary holding denying Darr the ability to recover the funds on the estates' behalf would ignore the economic substance of the TelexFree scheme. See Pepper v. Litton, 308 U.S. 295, 305 (1939) ("[F]raud will not prevail, . . . substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done."). Unless forbidden by text, we interpret statutes on the assumption that Congress would not have wanted the form of a transaction to overwhelm its substance, particularly in the context of criminal, fraudulent, or sham transactions. See Santander Holdings USA, Inc. v. United States, 844 F.3d 15, 21-23 (1st Cir. 2016).[9]

---

bankruptcy law more generally. See Cunningham v. Brown, 265 U.S. 1, 13 (1924) ("[E]quality is equity, and this is the spirit of the bankrupt law."). Allowing one group of victims to bring its claims first "thwarts the policy of ratable distribution" at the heart of bankruptcy law. XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.), 16 F.3d 1443, 1451 (6th Cir. 1994) (quotation omitted).

[9] We do not address arguments, not made in this case, as to other possible limitations (including timing limitations) on the trustee's avoidance power. We do take note of a comment by Judge Easterbrook:

> [I]n 1972 the Supreme Court used the phrase "lacks standing" to describe its conclusion that a bankruptcy trustee may not sue on behalf of investors who thought that a third party's acts had injured them and the debtor jointly. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972). The Court used the language of "standing" to refer, not to injury, causation, and redressability, the three ingredients of standing, see Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102-04 (1998), but to whether Congress had authorized a trustee to pursue a given kind of

B.    The Defendants' Unjust Enrichment Claims Are Derivative

At summary judgment, the district court granted Darr's request to enjoin the Defendants from further prosecuting their unjust enrichment claims based on the finding that such claims were derivative of Darr's Avoidance Actions and in violation of the Bankruptcy Code's automatic stay provision.  We understand the bankruptcy court, in performing this derivative analysis, to have been addressing PIEC's contention that PIEC's unjust enrichment claims are not an effort to exercise control over or obtain possession of even the Avoidance Actions within the meaning of § 362(a)(3), as Darr had contended before that court.  We affirm.

PIEC focuses most of its appeal on undermining Darr's standing to bring his Avoidance Actions, and then argues as to this second issue that the Defendants' unjust enrichment claims cannot be stayed or enjoined as derivative of Darr's claims if Darr's claims cannot be brought in the first place for lack of standing.  Since we hold TelexFree had a property interest in the Contested Funds, we affirm the bankruptcy court's finding that Darr has standing to bring his Avoidance Actions.  This resolves most of PIEC's arguments.

---

action.  Whether a given action is within the scope of the Code is a question on the merits rather than one of justiciability.

Grede v. Bank of N.Y. Mellon, 598 F.3d 899, 900 (7th Cir. 2010).

Nonetheless, we briefly analyze the meaning of a derivative claim under § 362. Besides arguing that the unjust enrichment claims are not derivative, PIEC does not make any arguments independently challenging the issuance of the injunctive relief under § 105(a), so we do not engage that issue.

Section 362(a)(3) automatically stays any act to "obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Darr argues that the avoidance causes of action themselves constitute the "property of the estate" as defined in 11 U.S.C. § 541. PIEC does not argue that such actions cannot constitute property of the estate. We accept Darr's contention and do not address alternative theories of what else could constitute such property. We hold that at least actions under §§ 547 and 548 can constitute property of the estate. Because PIEC's arguments for why the trustee lacks standing to pursue the Avoidance Actions fail, we treat the Avoidance Actions at issue as property of the estate.[10]

---

[10] Collier on Bankruptcy explains:

There is a conflict regarding whether a trustee's avoiding powers are property of the estate, an issue that arises when a trustee attempts to sell them to a third party. Two courts of appeals have held that avoiding power causes of action (at least those asserted under the strong-arm powers of section 544) are assets of the estate, while Official Committee of Unsecured Creditors of

This circuit has long recognized that causes of action can be property of the estate even though they are not specifically enumerated in the statute.  See Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.), 862 F.2d 896, 900 (1st Cir. 1988) ("Causes of action belonging to the debtor are included as property of the estate . . . .").

More recently, we found that this general rule applies to fraudulent conveyance claims specifically.  See Morley v. Ontos, Inc. (In re Ontos, Inc.), 478 F.3d 427, 431 (1st Cir. 2007) ("It is well established that a claim for fraudulent conveyance [brought pursuant to § 544] is included within [§ 541(a)(1)] property."); see also Cadle Co. v. Mims (In re Moore), 608 F.3d 253, 259-62 (5th Cir. 2010) (recognizing that avoidance claims under § 544 are property under § 541 and can be sold by the trustee); Briggs v. Kent (In re Prof'l Inv. Props. of Am.), 955 F.2d 623, 626 (9th Cir. 1992) (same).  Although Ontos dealt with fraudulent transfers

Cybernetics Corp. v. Chinery (In re Cybernetics Corp.)[, 226 F.3d 237, 244-47 (3d Cir. 2000),] is to the contrary.  The problem is created because section 541(a)(3) provides that proceeds of the avoiding power causes of action are property of the estate, but there is no corresponding provision with respect to the causes of action themselves.

5 Collier on Bankruptcy ¶ 541.12[4] (Richard Levin & Henry J. Sommer eds., 16th ed. 2018) (footnotes omitted).

claims brought under § 544, we think its reasoning extends as well to other avoidance actions under §§ 547 and 548.

This brings us to the issue of whether PIEC's unjust enrichment claims are derivative of Darr's Avoidance Actions and thus an impermissible attempt to obtain possession of or exercise control over Darr's Avoidance Actions in violation of 11 U.S.C. § 362(a)(3). The bankruptcy court ruled the unjust enrichment claims brought by PIEC are derivative of the trustee's Avoidance Actions because they seek to accomplish the same thing as the trustee's actions and to go about it in the same way. That is, PIEC has admitted that the proposed classes' efforts to prove unjust enrichment will not focus on any supposed wrongdoing by individual Net Winners. Rather, PIEC seeks to prove its unjust enrichment case through the overall fraudulent scheme created by TelexFree. That is what the trustee seeks to do.

PIEC seeks to undermine this analysis by pointing us to Caplin and other cases dealing with whether particular causes of action are best understood as belonging to the estate or individual creditors in terms of who is injured. See Caplin v. Marine Midland Grace Tr. Co. of N.Y., 406 U.S. 416, 434 (1972) (finding that a trustee did not have standing to assert creditors' claims); see also Steinberg v. Buczynski, 40 F.3d 890, 892 (7th Cir. 1994) (asking whether the debtor or creditor owned the claim by asking who was injured). But for the reasons just discussed, under the

framework adopted by the bankruptcy court, the unjust enrichment claims are best understood as avoidance actions in disguise. The bankruptcy estate as a whole was harmed, not any individual Net Loser. See Madoff II, 740 F.3d at 91 ("We are . . . wary of placing too much significance on the labels appellants attach to their complaints . . . .").

PIEC relies on its understanding of Madoff III, where the Second Circuit allowed investors in Madoff feeder funds to settle their lawsuits with these funds over objections by the Madoff trustee that these suits were derivative of his own fraudulent transfer actions. 762 F.3d at 209-11. But Madoff III is easily distinguishable. The claims here, in contrast, do not attempt to target individual Net Winners because of their own particular actions but seek to prove the claims through the Net Winners' membership in the TelexFree scheme. The court in Madoff III found that "none of [the defendants'] liability to the plaintiffs depends on the wrongfulness of Madoff's conduct." Id. at 210. In Madoff III, the court held that a claim alleging that a third party violated an independent duty owed to the plaintiff was not derivative of a trustee's claim seeking to avoid a transfer to that third party. Id. at 209-10. Here, PIEC's claims

necessarily compete with Darr's claims; they are not at all independent.[11]

Thus, PIEC has failed to show that the district court erred in concluding, in adopting the bankruptcy court's recommendations, that the unjust enrichment claims are "indistinguishable" from Darr's Avoidance Actions. The putative PIEC classes were harmed in the same way the rest of the TelexFree Net Loser creditors were harmed: they purchased worthless membership plans in a fraudulent Ponzi/pyramid scheme.

Because we reject the PIEC Defendants' argument that the unjust enrichment claims are not derivative of Darr's Avoidance Actions, we reject their challenge to the bankruptcy court's conclusion that their attempt to assert unjust enrichment claims is an attempt to exercise "control" over the Avoidance Actions, and thus property of the estate, in violation of the automatic stay. 11 U.S.C. § 362(a)(3). We have dealt with the arguments PIEC has raised and are not persuaded.

III.

Affirmed. Costs are awarded to Darr.

---

[11] We note, also, that the court in Madoff III analyzed the fraudulent transfer claims under § 362(a)(1), not § 362(a)(3) as we do here. In fact, the court cast doubt on whether a derivative analysis would be appropriate under § 362(a)(3). See Madoff III, 762 F.3d at 208. We need not resolve that issue to reject PIEC's argument as meritless.

- 28 -